# 14-1754-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Ernesto Espinoza, derivatively on behalf of JPMorgan Chase & Co.,

*Plaintiff-Appellant*,

v.

James Dimon, Douglas L. Braunstein, Michael J. Cavanagh, Ellen V. Futter, James S. Crown, David M. Cote, Laban P. Jackson, Jr., Crandall C. Bowles, James A. Bell, Lee R. Raymond, Stephen B. Burke, William C. Weldon, Ina R. Drew, David C. Novak,

*Defendants-Appellees*,

JPMorgan Chase & Co.,

*Nominal Defendant-Appellee*,

William H. Gray, III,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT**

| ROBBINS ARROYO LLP | LAW OFFICES OF THOMAS G. AMON |
|---|---|
| George C. Aguilar | Thomas Amon |
| Jay N. Razzouk | 250 West 57th Street, Suite 1316 |
| 600 B Street, Suite 1900 | New York, NY 10107 |
| San Diego, CA 92101 | (212) 810-2430 |
| (619) 525-3990 | |

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Ernesto Espinoza makes the following Corporate Disclosure Statement: Plaintiff-Appellant Ernesto Espinoza has no parent corporation and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

I.      JURISDICTIONAL STATEMENT ...................................................1

II.     STATEMENT OF ISSUES ...........................................................2

III.    STATEMENT OF THE CASE .......................................................3

        A.      Nature of the Case .........................................................3

        B.      Course of Proceedings.....................................................3

        C.      Disposition Below .........................................................4

IV.     STATEMENT OF FACTS ............................................................4

        A.      Defendant Dimon Leads the Transformation of the Company's
                Chief Investment Office from Risk Management to Risk Taking........4

        B.      The Individual Defendants Mislead the Public Regarding the
                CIO's Proprietary Trading and Losses Therefrom ..........................6

        C.      Early Fallout from the "London Whale" Scandal and the
                Individual Defendants' Improper Statements ...........................8

        D.      Plaintiff Demands the Board Investigate and Address the CIO ..........9

        E.      The Board Conspires with Management to Reach
                Predetermined Rejection of Plaintiff's Demand..................11

        F.      Government Investigations Confirm Gross Inadequacy of the
                Board's Investigation into the Improper Statements ...........................12

V.      SUMMARY OF THE ARGUMENT ...........................................15

VI.     THE DISTRICT COURT'S DISMISSAL OF THE COMPLAINT
        UNDER FEDERAL RULE 23.1 AND CHANCERY RULE 23.1
        SHOULD BE REVIEWED *DE NOVO* .......................................19

VII.    THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT
        THE ALLEGATIONS IN THE COMPLAINT FAILED TO REBUT
        THE BUSINESS JUDGMENT RULE PRESUMPTION..........................26

        A.      Applicable Legal Standards .....................................26

B.     The District Court Erroneously Applied a Legal Standard that Effectively Gave Complete Deference to the Board's Near Total Failure to Investigate the Material Portion of Plaintiff's Demand Concerning the Improper Statements ....................................................29

C.     The Particularized Allegations in the Complaint Raise a Reasonable Doubt that the Board Exercised Due Care and Good Faith in Responding to Plaintiff's Demand .........................................38

VIII.  THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING PLAINTIFF AN OPPORTUNITY TO AMEND .....................45

IX.    CONCLUSION.................................................................................50

CERTIFICATE OF COMPLIANCE.......................................................52

CERTIFICATE OF SERVICE ..............................................................53

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Abramowitz v. Posner*,
    672 F.2d 1025 (2nd Cir. 1982) ...................................................................25

*Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*,
    604 F. Supp. 1106 (D. Del. 1985) ..............................................................26

*Arnold ex rel. Chesapeake Energy Corp. v. McClendon*,
    No. CIV-11-986-D, 2012 WL 4483159 (W.D. Okla. Sept. 28,
    2012) ............................................................................................................29

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) *overruled on other grounds by*
    *Brehm* ...................................................................................................*passim*

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .........................................................................27

*Baron v. Siff*,
    No. 15152, 1997 WL 666973 (Del. Ch. Oct. 17, 1997) ...................30, 34, 46

*Behradrezaee v. Dashtara*,
    910 A.2d 349 (D.C. 2006) ...........................................................................29

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) .....................................................................*passim*

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) .......................................................................26

*City of Orlando Police Pension Fund v. Page*,
    970 F. Supp. 2d 1022 (N.D. Cal. 2013)...........................................29, 33, 38

*Comer v. Cisneros*,
    37 F.3d 775 (2d Cir. 1994) .........................................................................20

*Elfenbein v. Gulf & Western Industries, Inc.*,
    590 F.2d 445 (2d Cir. 1978). .......................................................24, 25, 45, 47

*Gamoran v. Neuberger Berman LLC*,
    536 F. App'x 155 (2d Cir. 2013).................................................................21

iv

*Gatz v. Ponsoldt*,
    No. CIV.A 174-N, 2004 WL 3029868 (Del. Ch. Nov. 5, 2004).......30, 34, 37

*Grimes v. Donald*,
    673 A.2d 1207 (Del. 1996) *overruled on other grounds by*
    *Brehm*.......................................................................................16, 27, 28

*Halebian v. Berv*,
    590 F.3d 195 (2d Cir. 2009) ...........................................................15, 20, 21

*Halpert Enters., Inc. v. Harrison*,
    No. 06 Civ. 2331(HB), 2007 WL 486561 (S.D.N.Y. Feb. 14,
    2007) ......................................................................................................27

*Halpert Enters., Inc. v. Harrison*,
    No. 07-1144-CV, 2008 WL 4585466 (2d Cir. Oct. 15, 2008) .........30, 32, 33

*In re Boston Scientific Corporation Shareholders Litigation*
    No. 02 CIV 247 AKH, 2007 WL 1696995 (S.D.N.Y. June 13,
    2007) ..................................................................................................33, 46

*In re ITT Corp. Derivative Litig.*,
    588 F. Supp. 2d 502 (S.D.N.Y. 2008) ...............................................19, 46, 47

*In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.*,
    773 F. Supp. 2d 330 (S.D.N.Y. 2011) ...........................................................46

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y.2008) ...........................................................47

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991).......................................................................................27

*Kaster v. Modification Systems, Inc.*,
    731 F.2d 1014 (2d Cir. 1984) ......................................................................24

*Kautz v. Sugarman*,
    456 F. App'x 16 (2d Cir. 2011).....................................................................21

*Kuck v. Danaher*,
    600 F.3d 159 (2d Cir. 2010) ........................................................................19

*Kwon v. Yun*,
    606 F. Supp. 2d 344 (S.D.N.Y. 2009) ..........................................................23

*Levine v. Smith*,
    591 A.2d 194 (Del. 1991) *overruled on other grounds*
    *by Brehm* ...................................................................................................*passim*

*Levner v. Saud*,
    903 F. Supp. 452 (S.D.N.Y. 1994) ................................................22, 26, 28

*Lewis v. Graves*,
    701 F.2d 245 (2d Cir. 1983) ...................................................................24, 25

*McMurray v. De Vink*,
    27 F. App'x 88 (3d Cir. 2002)......................................................................23

*Mount Moriah Cemetery v. Moritz*,
    No. CIV.A. 11431, 1991 WL 50149 (Del. Ch. Apr. 4, 1991)................30, 34

*New York v. Green*,
    420 F.3d 99 (2d Cir. 2005) ..........................................................................46

*Papilsky v. Berndt*,
    59 F.R.D. 95 (S.D.N.Y. 1973)...............................................................20, 24

*RCM Sec. Fund, Inc. v. Stanton*,
    928 F.2d 1318 (2d Cir. 1991) ......................................................................28

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*,
    66 A.3d 963 (Del. Ch. 2013) .................................................................31, 36

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990) ........................................................................46

*Scalisi v. Fund Asset Mgmt., L.P.*,
    380 F.3d 133 (2d Cir. 2004) .................................................................*passim*

*Scattered Corp. v. Chi. Stock Exch., Inc.*,
    701 A.2d 70 (Del. 1997), *overruled on other grounds by Brehm* ...........16, 28

*Scattered Corp. v. Chi. Stock Exch., Inc.*,
    No. CIV. A. 1040, 1996 WL 417507 (Del. Ch. July, 12, 1996) .......28, 32, 42

*Smith v. Van Gorkom*,
    488 A.2d 858 (Del. 1985) *overruled on other grounds by*
    *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009) ............................................32

*Spiegel v. Buntrock*,
    571 A.2d 767 (Del. 1990).............................................................................28

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) .................................................................20, 45

*Stepak v. Addison*,
    20 F.3d 398 (11th Cir. 1994) ...............................................................*passim*

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders*
    *In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
    407 F.3d 34 (2d Cir. 2005) ...........................................................................20

*Strougo v. BEA Assocs.*,
    No. 98 Civ. 3725 RWS, 2000 WL 45714 (S.D.N.Y. Jan. 19, 2000) ...........23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................27

*Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan v. UBS*
    *Fin. Servs. Inc. of P.R.*,
    704 F.3d 155 (1st Cir. 2013).........................................................................24

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011) ...................................................................45, 46

## STATUTES, RULES & OTHER AUTHORITIES

28 U.S.C.
    §1291 ...............................................................................................................1
    §1332(a)(2) ......................................................................................................1

Delaware Chancery Court Rule 23.1 ..............................................................*passim*

Federal Rule of Civil Procedure
    12(b)(6) .......................................................................20, 23, 26, 27
    15 .................................................................................18, 46, 48
    23.1 ..........................................................................................*passim*
    23.1(b)...........................................................................................26
    23.1(b)(3) .....................................................................................19

# I.    JURISDICTIONAL STATEMENT

The U.S. District Court for the Southern District of New York (the "District Court") had subject matter jurisdiction over this shareholder derivative action pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between plaintiff-appellant Ernesto Espinoza ("Plaintiff") and each defendant-appellee ("Defendants"),[1] and the amount in controversy exceeds the jurisdictional minimum.

On March 31, 2014, the District Court issued a Memorandum Decision and Order (the "Dismissal Order") (SPA1)[2] granting Defendants' motion to dismiss Plaintiff's Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment ("Complaint").  The same day, the District Court entered the judgment dismissing Plaintiff's Complaint "in its entirety."  SPA12.  The entry of judgment gives this Court appellate jurisdiction under 28 U.S.C. §1291.

---

[1] "Defendants" refers collectively to defendant-appellees James Dimon, Douglas L. Braunstein, Michael J. Cavanagh, Ellen V. Futter, James S. Crown, David M. Cote, Laban P. Jackson, Jr., Crandall C. Bowles, James A. Bell, Lee R. Raymond, Stephen B. Burke, William C. Weldon, Ina R. Drew, and David C. Novak (the "Individual Defendants") and nominal defendant-appellee JPMorgan Chase & Co. ("JPMorgan" or the "Company").  Former defendant William H. Gray, III (deceased) was voluntarily dismissed on August 15, 2013.  *See* Vol. III, A509-11.

[2] Citations herein to particular pages in the Special Appendix and Joint Appendix appear as "SPA__" and "Vol.__, A__" respectively, which appendices are filed concurrently herewith.  Additionally, throughout, all emphasis is deemed added and citations and footnotes are omitted unless otherwise noted.

1

Plaintiff timely filed his Notice of Appeal on April 29, 2014. Vol. IV, A857.

## II.    STATEMENT OF ISSUES

**Issue 1**: Whether this Court should apply a *de novo* standard of review to a district court's decision to dismiss a derivative action based on a purported failure to satisfy the demand pleading requirements of Rule 23.1 of the Federal Rules of Civil Procedure ("Federal Rule 23.1")[3] and Rule 23.1 of the Rules of the Court of Chancery of the State of Delaware ("Chancery Rule 23.1").

**Issue 2:** Whether, for purposes of surviving a motion to dismiss pursuant to Federal Rule 23.1 and Chancery Rule 23.1, Plaintiff's Complaint raises a reasonable doubt that JPMorgan's Board of Directors ("Board") exercised valid business judgment in connection with refusing Plaintiff's pre-suit demand ("Demand") where the particularized allegations in the Complaint and attachments thereto show, among other things, the Board rejected the Demand without investigating a material portion of wrongdoing identified in Plaintiff's Demand.

**Issue 3:** Whether the District Court abused its discretion by dismissing the Complaint in its entirety and entering judgment against Plaintiff without granting leave to amend where Plaintiff had not yet amended his Complaint, Plaintiff had requested leave to amend, and the record established substantial, additional facts

---

[3] Additional references herein to the Federal Rules of Civil Procedure will appear as "Federal Rule ___."

2

that further support the allegations in the Complaint and rectify the purported pleading deficiency.

## III.    STATEMENT OF THE CASE

Plaintiff appeals the dismissal "in its entirety" of his shareholder derivative Complaint as ordered by the Honorable George B. Daniels of the U.S. District Court for the Southern District of New York.  SPA11-12.

### A.    Nature of the Case

Plaintiff, as a shareholder of the Company, brings this shareholder derivative action on behalf of nominal defendant JPMorgan.  Plaintiff's Complaint asserts claims for breach of fiduciary duty, corporate waste, and unjust enrichment against certain current and former directors and officers of JPMorgan for, among other things, their role in causing the Company to engage in high-risk trading practices and disseminating improper statements to the public relating thereto.

Before bringing this case, Plaintiff made a demand on JPMorgan's Board to investigate and bring the claims now asserted in the Complaint.  The Board rejected Plaintiff's Demand.  The Complaint sets forth reasons why the Board's refusal to comply with Plaintiff's Demand was wrongful – in other words, the Board did not exercise valid business judgment in connection with responding to the Demand.

### B.    Course of Proceedings

Plaintiff filed his derivative Complaint on behalf of JPMorgan in the District

Court on April 9, 2013. Vol. I, A7. On July 10, 2013, Defendants filed a motion to dismiss the Complaint pursuant to Federal Rule 23.1 and Chancery Rule 23.1. Vol. I, A88-89. After the parties submitted their briefing, the District Court heard further arguments during a hearing on October 3, 2013. Vol. IV, A709.

### C.    Disposition Below

On March 31, 2014, the Honorable George B. Daniels of the District Court issued the Dismissal Order and a separate Judgment, both granting Defendants' motion to dismiss the Complaint and dismissing the Complaint "in its entirety." SPA11-12. As explained in the unpublished Dismissal Order, the District Court ruled that the allegations in the Complaint did not overcome the presumption under Delaware law that the Board exercised proper business judgment in rejecting Plaintiff's Demand. SPA7-11.

## IV.    STATEMENT OF FACTS

### A.    Defendant Dimon Leads the Transformation of the Company's Chief Investment Office from Risk Management to Risk Taking

The Complaint details the scope of the infamous "London Whale" scandal that has plagued JPMorgan, among a host of other financial, personnel, legal and regulatory failures, over the last several years. As explained and detailed in the Complaint, the root of the "London Whale" scandal traces to a transformation spearheaded by defendant Dimon, JPMorgan's Chief Executive Officer (CEO") and Chairman of the Board, of JPMorgan's Chief Investment Office (the "CIO").

Vol. I, A10 (¶2), A17 (¶20), A30 (¶¶51-52).  Although the CIO was initially responsible for conservatively investing excess liabilities (i.e., deposits made with the Company's banking business that exceed loans it has made) and managing long-term interest rate and currency exposure, under Dimon's "new vision," it was changed into a proprietary trading[4] desk whose principal purpose was to engage in speculative, high-risk trading.  Vol. I, A10 (¶2), A16 (¶19), A29 (¶48-49), A30 (¶¶51-52).

In order to meet defendant Dimon's "new vision" for the CIO, defendant Drew, JPMorgan's Chief Investment Officer and the head of the CIO, facilitated and encouraged aggressive and speculative positions without necessary and foundational internal controls that caused the CIO to swell the riskiest components of its portfolio, including synthetic-credit derivatives.  Vol. I, A10-11 (¶3), A30-33 (¶¶51-59), A48 (¶93).  Synthetic-credit derivatives are made up of investments tied to corporate and government debt.  Vol. I, A11 n.3.  By the end of 2009, the Company's multi-billion dollar synthetic-credit portfolio, which was managed by a London-based trader named Bruno Iksil, constituted such a large part of the market for synthetic-credit derivatives that the Company's position became illiquid and

---

[4] Proprietary trading occurs when a financial firm trades stocks, bonds, currencies, commodities, their derivatives, or other financial instruments, with the firm's own money as opposed to its customers' money, so as to make a profit for itself.  Vol. I, A10 n.2.

was driving price moves in the market.  Vol. I, A10-11 (¶3), A35-36 (¶¶66-67).
The positions taken by Iksil alone were so massive that hedge-fund traders
nicknamed him – then unknown at the time – the "London Whale."  Vol. I, A33
(¶59).

The Company's own model for measuring risk alerted at least defendants
Dimon and Drew by 2011 that the CIO's synthetic-credit portfolio had grown to "a
perilous size."  Vol. I, A11 (¶4), A32 (¶57), A35 (¶64).  JPMorgan could not,
however, reduce the CIO's synthetic-credit portfolio without selling assets at
enormous losses which would have revealed the truth about the CIO's risky trading
practices.  Vol. I, A11 (¶4), A34-35 (¶¶63-64).  Accordingly, in order to conceal
the true purpose of and risk associated with the CIO, defendant Dimon caused
JPMorgan to secretly replace the Company's risk model, resulting in JPMorgan
improperly reporting in the first quarter of 2012 that the CIO's risk of loss was the
same as the prior quarter when, in truth, the Company's risk metrics showed that
the risk of loss had doubled.  Vol. I, A11 (¶4), A35 (¶¶64-65).

### B.    The Individual Defendants Mislead the Public Regarding the CIO's Proprietary Trading and Losses Therefrom

By April 2012, the losses in the synthetic-credit portfolio had already
reached nearly $1 billion, and internal JPMorgan reports were warning that the
synthetic-credit portfolio stood to lose billions more.  *See, e.g.*, Vol. I, A11 (¶5),
A32-33 (¶¶56, 60), A44 (¶83), A47-48 (¶92).

6

Despite the warnings and growing losses, the Individual Defendants, including defendants Dimon and Braunstein, JPMorgan's Chief Financial Officer ("CFO") and Vice Chairman of the Board, misled the public by significantly understating losses for the first quarter of 2012, misrepresenting the CIO's new role as a proprietary trading desk, dismissing analysts' concerns regarding the CIO, and downplaying the warnings in the media about the Company's trading position in its synthetic-credit portfolio. *See, e.g*., Vol. I, A11-12 (¶5), A36-40 (¶¶68-72), A56-57 (¶¶112-13). For example, defendant Dimon publicly labeled the negative news about the portfolio a "*tempest in a teapot*." Vol. I, A11-12 (¶5), A39-40 (¶72).

The CIO's losses have surpassed *$6.25 billion*, more than the Company publicly reported as net income in the entire first quarter of 2012, and over 29% of the Company's publicly reported net income for the full year 2012. Vol. I, A12 (¶6), A42 (¶77).

Defendant Dimon has now admitted that the Company's "new strategy," which he led the charge in adopting, "*was flawed, complex, poorly reviewed, poorly executed, and poorly monitored*." Vol. I, A12 (¶6), A40-41 (¶75). Defendant Dimon admitted that "[t]hese were *egregious mistakes*" for which he and the other Individual Defendants were "*accountable*." *Id*. Similarly, defendant Cavanagh, JPMorgan's Co-CEO of the Corporate and Investment Bank, acknowledged that the CIO never should have been engaging in the synthetic-

credit transactions that led to the massive losses and that such trades were inconsistent with the CIO's publicly represented risk management function.  Vol. I, A12 (¶6), A42-44 (¶¶79-83).

### C.   Early Fallout from the "London Whale" Scandal and the Individual Defendants' Improper Statements

Beginning in April 2012, shortly after the CIO first drew public attention, the U.S. Senate initiated an inquiry into the Company.  Vol. I, A45-46 (¶87).  On June 13, 2012, the U.S. Senate Committee on Banking, Housing, and Urban Affairs held a hearing in which defendant Dimon was called to testify about the "London Whale" trades and the oversight of the CIO.  *Id*.  There, Senator Tim Johnson (D-SD) criticized defendant Dimon's misleading statements concerning the CIO's risky trading activities and its resulting enormous losses.  *Id*.On July 13, 2012, JPMorgan announced that the Company would be forced to restate its financial statements for the first quarter of 2012 to account for the CIO's material losses.  Vol. I, A12 (¶7), A42 (¶78).  Moreover, the Company acknowledged that JPMorgan's internal controls for the CIO were inadequate to effectively manage the risks associated with the CIO's complexity.  Vol. I, A12 (¶7), A44 (¶83).

The Individual Defendants' breaches of fiduciary duty have also exposed the Company to liability in lawsuits for violations of federal securities laws and the Employee Retirement Income Security Act and various civil, criminal, and regulatory investigations.  *See, e.g.*, Vol. I, A13 (¶¶8-9), A45-47 (¶¶85-90), A49-

50 (¶97).  When the Complaint was filed, the Company was being investigated by Congress, the Office of the Comptroller of the Currency (the "OCC"), the Federal Reserve, the Department of Justice (the "DOJ"), the Federal Bureau of Investigation (the "FBI"), the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), and the United Kingdom Financial Services Authority (the "FSA").  *See, e.g.*, Vol. I, A13 (¶9), A45 (¶85), A47 (¶90).

### D. Plaintiff Demands the Board Investigate and Address the CIO

On May 23, 2012, Plaintiff sent his Demand to the Board, asking the Board to, among other things, "investigate, address, and commence proceedings against certain officers, employees, and directors of the Company for violations of any applicable laws" concerning their responsibility for JPMorgan's "failed hedging strategy" at the CIO, the lack of "adequate risk exposure and internal financial controls," and the "*dissemination of the materially false/misleading statements and omissions regarding the risk exposure*."  Vol. I, A13-14 (¶10), A51 (¶102); *see generally* Vol. I, A65-70.  Plaintiff further demanded that, following the investigation, "JPMorgan initiate legal proceedings against those responsible for the wrongdoing and misconduct described," as well as "implement corporate governance measures to prevent future dissemination of improper statements." Vol. I, A51 (¶102), A69-70.

9

A vast portion of the Demand concerns the dissemination of the improper public statements.  For instance, the Demand:

- details how defendants Dimon and Braunstein dismissed concerns about the CIO's trading activities and attempted to downplay the CIO's accruing losses (*see* Vol. I, A65-66);

- quotes criticism of defendant Dimon's statements (Vol. I, A66);

- notes that the SEC opened a preliminary investigation into JPMorgan's disclosures related to the CIO's trades (*id*.);

- discusses how defendants Dimon's and Braunstein's improper statements and material omissions artificially inflated the Company's stock price at a time when the Board authorized stock buybacks (Vol. I, A67);

- identifies lawsuits filed by investors against JPMorgan concerning improper statements (*id.*);

- lists damages to JPMorgan arising from the improper statements, including costs relating to lawsuits for violations of securities laws and costs incurred in responding to the SEC's investigation, as well as the investigations by the Federal Reserve, the FSA, and the CFTC (*id*.);

- explains that defendants Dimon and Braunstein are named as defendants in a securities class action complaint for violating various sections of the Securities Exchange Act of 1934, and that they are liable to the Company for damages caused directly by their improper statements (Vol. I, A68); and

- as noted above, demands that the Board make determinations regarding who was responsible for the dissemination of the improper statements and implement reforms to prevent future improper statements (Vol. I, A69-70).

10

### E.    The Board Conspires with Management to Reach Predetermined Rejection of Plaintiff's Demand

In response to Plaintiff's Demand, the Board established a purported "independent committee" – comprised of defendants Raymond, Jackson, and Weldon – to investigate the matters in the Demand (the "Review Committee"). Vol. I, A13-14 (¶10), A52-53 (¶106).    Rather than conducting an impartial investigation, the Review Committee, relied substantially on the investigation by the so-called "Task Force," an internal management team created by the Company to investigate the CIO's losses led by defendant Cavanagh, who has been defendant Dimon's trusted colleague and confidant for twenty years.  A54-57 (¶¶108-13).  As one would expect, the Task Force shifted the blame away from the Company's management and onto lower-level CIO employees and management.  Vol. I, A14-15 (¶12), A49(¶96), A54 (¶109).  Indeed, the Task Force's report has received sharp criticism by analysts, including a former chairman of the SEC.  Vol. III, A543 & n.24.

The Board rejected Plaintiff's Demand in a letter dated February 5, 2013 (Vol. I, A14 (¶11), A55-56 (¶111)), although various of the government investigations were still ongoing, including those by the U.S. Senate, the SEC, the Federal Reserve, the FSA, and the CFTC. *See, e.g*., Vol. IV, A804:17-21, A808:4-21.  In fact, the Board acknowledged the ongoing investigations, stating that it would "continue to monitor the litigation and regulatory actions relating to the CIO

11

losses." Vol. I, A86. In rejecting the Demand, the Review Committee and the Board followed the "observations" and "findings" of the Task Force. Vol. I, A14-15 (¶12), A55-57 (¶¶111-13), A83-85.

Besides the misplaced reliance on the Task Force report, the Review Committee's investigation was improperly limited in scope. Vol. I, A56 (¶113). For example, although the Board purportedly tasked the Review Committee with "investigat[ing], among other things, the matters and proposed actions referred to in [Plaintiff's] [D]emand," and despite the Demand's substantial focus on the improper statements, *the Review Committee never evaluated potential liability for the false and misleading statements* primarily disseminated by defendants Dimon and Braunstein concerning the high risk exposure of the CIO's trading practices and the losses suffered as a result thereof. Vol. I, A13-15 (¶¶10, 13), A56-57 (¶113); *compare, e.g.*, Vol. I, A51 (¶102), *with* A52-53 (¶106). Nor did the Task Force, the Review Committee, or the Board take any remedial action with regard to the improper statements. *See, e.g.*, Vol. I, A55-57 (¶¶111, 113), A83-86; Vol. II, A260-62, A377-90; Vol. III, A537.

### F. Government Investigations Confirm Gross Inadequacy of the Board's Investigation into the Improper Statements

On March 14, 2013, the Senate's Permanent Subcommittee on Investigations (the "Senate Subcommittee"), led by Senator Carl Levin (D-MI), issued a 301-page report on the CIO's trading practices and massive losses. Vol. I, A13 (¶9), A47-48

(¶92).  The Senate Subcommittee's report detailed how defendant Dimon and other officials at the Company ignored internal warnings about the complex derivatives traded through JPMorgan's London office and masked them from regulators and shareholders.  *Id*.  The report also detailed how specific executives, including defendants Dimon and Drew, used the Company's synthetic-credit portfolio to engage in high-risk derivatives trading and kept hundreds of millions of dollars off the Company's balance sheets.  Vol. I, A48 (¶93).  According to the report, federal authorities were not aware that JPMorgan was participating in such risky trades because the Company, ***at defendant Dimon's direction***, concealed information about its synthetic-credit portfolio.  *Id.*

The next day, on March 15, 2013, certain of the Individual Defendants, including defendants Drew, Braunstein, and Cavanagh, were summoned to testify before the Senate Subcommittee.  Vol. I, A48-49 (¶94).  Senator Levin stated that the financial results and CIO losses that the Company reported to regulators were well below what was known inside the bank.  *Id.*  During the hearing, defendant Braunstein testified that defendant ***Dimon ordered*** JPMorgan to stop sending required information that revealed the Company had accumulated billions of dollars in trading losses to government regulators.  *Id.*  Moreover, defendant Braunstein acknowledged that risk models for the trading operation were changed in a way that was improper in early 2012, and that the changes made the

13

Company's trading losses appear smaller than they were. *Id.* Senator Levin also repeatedly confronted defendants Drew and Braunstein with the inaccurate and improper statements they made during the course of the scandal. Vol. I, A49 (¶95). The senator concluded the hearing by stating that the "***trading culture at JPMorgan ... piled on risk, hid losses, disregarded risk limits, manipulated risk models, dodged oversight and misinformed the public***." *Id.*

On April 9, 2013, Plaintiff filed this case. Vol. I, A7.

On September 19, 2013, JPMorgan entered into agreements to resolve investigations with the SEC, the Federal Reserve, the OCC, and the FSA requiring JPMorgan to pay $920 million in fines, $200 million of which was payable to the SEC. Vol. III, A572, A591; Vol. IV, A792:11-23. As Plaintiff's counsel noted to the District Court, the "SEC specifically found specific disclosure failures by senior management," including defendants Dimon and Braunstein. Vol. IV, A792:23-793:2; *see also, e.g.*, Vol. III, A576, A579-80 (¶29), A589 (¶76).

On October 16, 2013, the CFTC issued an order instituting proceedings pursuant to the Commodity Exchange Act, making findings, and imposing remedial sanctions (the "CFTC Order"). *See generally* Vol. IV, A819-37. For violating the Commodity Exchange Act, JPMorgan consented to the CFTC Order by which it expressly admitted to the findings of fact and agreed to pay a civil penalty of $100 million. Vol. IV, A831-35.

14

## V.    SUMMARY OF THE ARGUMENT

Plaintiff makes three primary arguments on appeal.

*First*, the Court should review *de novo* the District Court's decision to dismiss the Complaint.  Motions to dismiss are generally reviewed *de novo*.  This is especially the case where, as here, "'a challenge is made to the legal precepts applied by the district court.'"  *Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009). Traditionally, however, courts in this Circuit have seemingly followed a discretionary standard of review for dismissals based on a purported failure to satisfy the demand pleading requirements of Federal Rule 23.1.  Over the past decade, this Court has repeatedly questioned whether discretionary review is appropriate on this type of motion to dismiss.  As the Court recognized, "when a trial court rules on the legal sufficiency of a complaint the question presented should be one of law," and such a ruling is reviewed *de novo*.  *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 137 n.6 (2d Cir. 2004).  This same reasoning prompted the Delaware Supreme Court to clarify that it reviews *de novo* dismissals pursuant to Chancery Rule 23.1.  *See Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000). Many other state and federal courts have similarly been trending toward *de novo* review.  These trends are significant, as the once general adoption of the discretionary standard of review served as a rationale for initially applying the standard in this Circuit.  Meanwhile, other early-adoption cases in this Circuit

15

applied the discretionary standard with little explanation or flawed reasoning. Determinations that a derivative complaint fails to satisfy the demand pleading requirements of Federal Rule 23.1 should be reviewed *de novo*.

*Second*, regardless of which standard of review this Court applies, it should reverse the District Court's determination that the allegations in the Complaint are conclusory and thus unable to rebut the business judgment rule's presumptive protection over the Board's decision to reject the Demand.   Under applicable Delaware law, a plaintiff bears the burden of rebutting the presumption that a Board exercised valid business judgment in rejecting a demand.   A shareholder plaintiff can rebut this presumption by alleging particularized facts that raise a "reasonable doubt" that, in responding to the demand, the board either acted (i) in good faith or (ii) reasonably and with due care.   *See Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 73 (Del. 1997) ("*Scattered II*"), *overruled on other grounds by Brehm*; *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996) *overruled on other grounds by Brehm*.   The District Court incorrectly concluded that the allegations in Plaintiff's Complaint were "insufficient to overcome the presumption of the business judgment rule."   SPA11.

The District Court's erroneous conclusion was in part based on an incorrect application of the legal standards governing its review of the Board's decision to reject the Demand.   Corporate directors must act on an informed basis in

16

responding to a shareholder's demand, meaning they must consider "***all material*** ***information*** reasonably available" to them. *Brehm*, 746 A.2d at 259; *Levine v.* *Smith*, 591 A.2d 194, 213 (Del. 1991) *overruled on other grounds by Brehm.* Directors cannot disregard information that is "so obvious that the board's failure to consider it was grossly negligent." *Brehm*, 746 A.2d at 262. Despite these and other principles establishing the gross negligence standard by which a board's response to a demand is assessed, the District Court tied its hands by selectively quoting and stringing together certain cases to form a lopsided standard that no plaintiff could ever overcome. In essence, the District Court created and applied an incorrect rule that any decision by a board to limit the scope of its investigation pursuant to a shareholder demand is protected by the business judgment rule. But not even the cases cited by the District Court support this. Rather, they show that courts sometimes will reject arguments by plaintiffs that merely amount to nitpicking a board's investigative efforts. That is not the case here. The Board did not investigate an obviously material – if not core – part of Plaintiff's Demand: the improper public statements made by the Individual Defendants. This abdication of responsibility falls outside the protection of the business judgment rule or otherwise constitutes gross negligence — if not bad faith.

In addition to misapplying legal standards, the District Court erred in assessing the legal sufficiency of Plaintiff's wrongful refusal allegations. The

District Court incorrectly concluded that *all* of Plaintiff's wrongful refusal allegations were "conclusory." *See* SPA8-9, 11. This conclusion cannot be reconciled with particularized allegations in the Complaint and its attachments showing, for example, how the Board did not investigate the improper statements despite their materiality. *See, e.g.*, Vol. I, A13-15 (¶¶10, 13), A56-57(¶113). Plaintiff went further, however, showing how additional facts in the record bolster these allegations. For example, the Task Force report did not address the improper statements. Nor were any corporate governance changes adopted nor other steps taken to remedy the improper statements as Plaintiff demanded. Moreover, Plaintiff identified various material facts demonstrating that the improper statements were a subject requiring the Board's careful consideration, including a timeline of government investigations and other matters relating to the improper statements that the Board should have been aware of before it rejected Plaintiff's Demand.

*Finally*, to the extent dismissal of the Complaint was appropriate, the District Court nonetheless abused its discretion by implicitly denying Plaintiff's request for leave to amend. Leave should be freely given when justice so requires (*see* Federal Rule 15), and may only be withheld under limited circumstances such as when amendment would be "futile." Plaintiffs are routinely given at least one opportunity to replead in complex shareholder derivative actions like this case, and

especially where the complaint was dismissed "for lack of specificity." *See In re ITT Corp. Derivative Litg.*, 588 F. Supp. 2d 502, 515-16 (S.D.N.Y. 2008).

Despite the complexity of this derivative action, and despite Plaintiff's request for leave to amend, the District Court entered judgment against Plaintiff without ever affording him an opportunity to replead.  In doing so, the District Court also passed over numerous, substantial facts demonstrating that amendment would not be futile.  For example, Plaintiff specifically identified materials Defendants introduced with their motion to dismiss and substantial developments in the context of government prosecutions.  These allegations would have remedied the purported deficiencies in the Complaint identified by the District Court – namely, that all the allegations are "conclusory" and insufficient to satisfy Federal Rule 23.1 and Chancery Rule 23.1.  It was therefore an abuse of discretion to dismiss the Complaint without giving Plaintiff a chance to amend.

## VI.  THE DISTRICT COURT'S DISMISSAL OF THE COMPLAINT UNDER FEDERAL RULE 23.1 AND CHANCERY RULE 23.1 SHOULD BE REVIEWED *DE NOVO*

This Court should apply a *de novo* standard of review to a district court's decision to dismiss a derivative action based on a purported failure to satisfy the demand pleading requirements of Federal Rule 23.1(b)(3) and Chancery Rule 23.1.

Generally, orders granting motions to dismiss are reviewed *de novo*.  *Kuck v. Danaher*, 600 F.3d 159, 162 (2d Cir. 2010) ("A district court's decision granting a

19

motion to dismiss is subject to *de novo* review."); *Comer v. Cisneros*, 37 F.3d 775, 786 (2d Cir. 1994) ("We review the grant of a motion to dismiss or summary judgment *de novo*…."). This is the case, for example, for motions to dismiss for failure to state a claim made pursuant to Federal Rule 12(b)(6). *See e.g., Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) ("We review *de novo* a district court's dismissal of a complaint for failure to state a claim under Federal Rules of Civil Procedure Rule 12(b)(6)….").[5]

The District Court treated Federal Rule 12(b)(6) as the basis for Defendants' motion to dismiss. SPA2, 12. If the District Court was right, the Dismissal Order should thus, without question, be reviewed *de novo*. However, Defendants state in their notice of motion and accompanying brief that they move to dismiss "pursuant to Federal Rule of Civil Procedure 23.1 and Delaware Court of Chancery Rule 23.1…." Vol. I, A88-89, A96, A108-09.

Courts in this Circuit have traditionally departed from the general rule of *de novo* review and instead applied an abuse of discretion standard to dismissals for failure to satisfy the demand pleading requirements of Federal Rule 23.1. *See, e.g., Halebian*, 590 F.3d at 203; *Papilsky v. Berndt*, 59 F.R.D. 95, 96-97 (S.D.N.Y.

---

[5] Dismissals based on standing are also reviewed *de novo*. *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 43 (2d Cir. 2005) ("Our review of the district court's dismissal of the action for lack of standing is *de novo*.").

1973).  Nonetheless, where '"a challenge is made to the legal precepts applied by the district court in making a discretionary determination, plenary review of the district court's choice and interpretation of those legal precepts is appropriate."' *Halebian*, 590 F.3d at 203; *Scalisi*, 380 F.3d at 137.  Thus, the District Court's choice and interpretation of the standards governing its review of the Board's response to Plaintiff's Demand, discussed *infra* at VII.B., are subject to *de novo* review by this Court.

To the extent the standard of review would affect the outcome of this appeal, the District Court's assessment of the sufficiency of Plaintiff's allegations should also be reviewed *de novo*.  During the past decade, this Court has repeatedly questioned the abuse of discretion standard of review for Federal Rule 23.1 dismissals and noted it may join other courts in adopting a *de novo* review when the Court "confronts a case in which the standard selected might affect the outcome." *Scalisi*, 380 F.3d at 137 n.6.  *See also, e.g.*, *Kautz v. Sugarman*, 456 F. App'x 16, 18 (2d Cir. 2011) (noting that "we have theorized that we may review [demand futility] rulings for abuse of discretion," but "declin[ing] to address here what seems to be an open question of the appropriate standard of review in demand futility cases … because our ruling today would be required under either standard"); *Gamoran v. Neuberger Berman LLC*, 536 F. App'x 155, 157 (2d Cir.

2013) (observing that "[t]he correct standard of review remains an open question" for dismissals based on Federal Rule 23.1).

Plenary review of Federal Rule 23.1 dismissals would harmonize with the principles governing motions to dismiss. As this Court explained in *Scalisi*, "when a trial court rules on the legal sufficiency of a complaint the question presented should be one of law. When an appellate court reviews such a ruling, review should be *de novo*." 380 F.3d at 137 n.6. Logic dictates that these principles be applied in derivative actions where the trial court is testing the legal sufficiency of a plaintiff's demand allegations on a motion to dismiss. *See, e.g., Levner v. Saud*, 903 F. Supp. 452, 457 (S.D.N.Y. 1994) ("In a shareholder derivative suit, in order to conform to the requirements of Federal Rule 23.1, the shareholder plaintiff is required to allege with particularity ***'legally sufficient reasons*** to call into question the validity of the Board of Directors' exercise of business judgment.'") (citation omitted); SPA7 (quoting *Levner*).

Indeed, this was the very reasoning of the Supreme Court of Delaware when it clarified in *Brehm* that dismissals under Chancery Rule 23.1 (Delaware's analogous rule to Federal Rule 23.1)[6] should be reviewed *de novo*:

---

[6] *See* SPA7 n.7; *Stepak v. Addison*, 20 F.3d 398, 402 (11th Cir. 1994) ("The wording of Delaware Chancery Court Rule 23.1 is identical to its federal counterpart in all material respects.").

*Analyzing a pleading for legal sufficiency is not, for example, the equivalent of the deferential review of certain discretionary rulings*, such as: an administrative agency's findings of fact; a trial judge's evaluation of witness credibility; findings of the Court of Chancery in a statutory stock appraisal; a decision whether to grant or deny injunctive relief or the scope of that relief; or what rate of interest to apply. *In a [Chancery] Rule 23.1 determination of pleading sufficiency, the Court of Chancery, like this Court, is merely reading the English language of a pleading and applying to that pleading statutes, case law and [Chancery] Rule 23.1 requirements. To that extent, our scope of review is analogous to that accorded a ruling under Rule 12(b)(6)*.

746 A.2d at 253-54 (emphasis added and citations omitted).

Delaware's *de novo* standard of review bears substantial weight in this case. Defendants in part moved to dismiss pursuant to Chancery Rule 23.1.  Vol. 1, A88-89, A96, A108-09.   Delaware courts are also universally recognized for their expertise and leadership in corporate law.  *See, e.g.*, *Kwon v. Yun*, 606 F. Supp. 2d 344, 365 (S.D.N.Y. 2009) ("[T]his Court defers to the judgment of the Delaware courts, which have far more expertise in construing their own law and are widely recognized as leaders in the area of corporate law."); *Strougo v. BEA Assocs.*, No. 98 Civ. 3725 RWS, 2000 WL 45714, at *5 (S.D.N.Y. Jan. 19, 2000) ("[T]he Court of Chancery has a well-recognized expertise in the field of state corporation law."); *McMurray v. De Vink*, 27 F. App'x 88, 93 (3d Cir. 2002).

Delaware is not alone in transitioning to a *de novo* standard of review.  As recognized by the First Circuit when it recently adopted a *de novo* review for dismissals involving demand futility pleading, federals courts – in addition to this

Court – have questioned the discretionary standard of review, while "[s]tate courts have trended even more strongly toward plenary review." *Unión de Empleados de Muelles de P.R. PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of P.R.*, 704 F.3d 155, 162-63 (1st Cir. 2013).

These trends are significant because a rationale for initially adopting the discretionary standard in this Circuit seems to have been its once general adoption by other courts. In the 1973 decision of *Papilsky*, the district court cited a treatise observing that "'probably the most straightforward approach is to admit frankly that it lies within the sound discretion of the court to determine the necessity of demand,'"[7] and the court added that other courts generally followed this "discretionary approach." 59 F.R.D. at 96-97 (citing cases from the Tenth Circuit, Fifth Circuit, and Seventh Circuit). Later, in *Elfenbein v. Gulf & Western Industries, Inc.*, this Court relied on *Papilisky*, seeming to thereby establish discretionary review as the standard. 590 F.2d 445, 450 (2d Cir. 1978). *Elfenbein* was later cited in *Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983). And in *Kaster v. Modification Systems, Inc.*, this Court cited *Lewis* and *Elfenbein* for the proposition that the court has "repeatedly held that determination of the sufficiency of the allegations of futility depends on the circumstances of the individual case

---

[7] Departing from the typical *de novo* review for motions to dismiss hardly seems "'the most forward approach'" in light of the principles noted by this Court and explicated by the Delaware Supreme Court in clarifying its standard of review.

24

and is within the discretion of the district court."  731 F.2d 1014, 1018 (2d Cir. 1984).   But as this Court has more recently observed, "[t]he abuse of discretion standard referred to in *Elfenbein, Lewis* and *Kaster* is puzzling."  *Scalisi*, 380 F.3d at 137 n.6.  The flawed, outdated abuse of direction standard of review should be replaced with *de novo* review.

Other early discretionary-standard cases are built on similarly shaky ground. For example, in *Abramowitz v. Posner*, the court for the most part applied a discretionary standard without explaining why.  *See generally* 672 F.2d 1025, 1033 (2nd Cir. 1982) (holding "the district court did not abuse its discretion in requiring [plaintiff] to make a demand").  Granted, the court noted that the district court "was forced to decide this case at a time when Delaware law was unclear…."  *Id.* at 1029.   Yet that would not explain why the court also applied the "'clearly erroneous'" standard of Federal Rule 52, treating Federal Rule 23.1 determinations on the pleadings as if they were findings of fact.  *Id.* at 1034.  As discussed above, decisions testing the sufficiency of the pleadings raise questions of law, not fact, and thus logically should be subject to plenary review.  *Lewis*, mentioned above, is further worthy of this Court's criticism in *Scalisi* because it also followed the truly "puzzling" application of the discretionary standard of *Abramowitz*.  *See* 701 F.2d at 248; *Scalisi*, 380 F.3d at 137.

Whether the District Court was determining the standards to apply or assessing the sufficiency of Plaintiff's allegations, the District Court was making determinations of law, which should be reviewed *de novo*. Granted, even under a discretionary standard of review, the District Court must be reversed.

## VII.  THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT THE ALLEGATIONS IN THE COMPLAINT FAILED TO REBUT THE BUSINESS JUDGMENT RULE PRESUMPTION

### A.    Applicable Legal Standards

Defendants moved to dismiss pursuant to Federal Rule 23.1 and Chancery Rule 23.1. Vol. I, A88-89, A96. Federal Rule 23.1 requires a derivative complaint to "state with particularity … any effort by the plaintiff to obtain the desired action from the directors" and "the reasons for not obtaining the action or not making the effort." Federal Rule 23.1(b). The requirements of Chancery Rule 23.1 are virtually the same. *See* SPA7 n.4 (citing *Levner*, 903 F. Supp. at 456 n.4; *accord Allison on Behalf of Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1116 n.11 (D. Del. 1985)).

The District Court correctly recognized that the "particularity" standard of Federal Rule 23.1 is higher than the notice pleading standard for a Federal Rule 12(b)(6) motion (*see* SPA6), yet the factual allegations in a derivative complaint are still "deemed to be true for the purposes of a motion to dismiss" (SPA2 n.3 (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). *Accord Scalisi*, 380 F.3d at 137 ("[W]e view the facts in the light most favorable to the

non-moving party."). As Defendants recognized, a court may also consider attachments to the complaint and documents referenced therein for purposes of determining a motion to dismiss. *See also* Vol. I, A101 n.2 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).[8]

"Although Fed. R. Civ. P. 23.1 outlines the procedural rules with which a derivative action in federal court must comply, state law provides the substantive law governing a Board's refusal of a demand." *Halpert Enters., Inc. v. Harrison*, No. 06 Civ. 2331(HB), 2007 WL 486561, at *4 (S.D.N.Y. Feb. 14, 2007) ("*Halpert I*"); *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991). The parties and the District Court agree that, because JPMorgan is a Delaware corporation, Delaware provides the substantive law governing wrongful refusal in this case. SPA7.

Under Delaware law, if a plaintiff adequately alleges that a board of directors' wrongfully refused his pre-suit demand, the board's refusal cannot serve as a basis for dismissing a derivative action. *See, e.g.*, *Grimes*, 673 A.2d at 1207; *Levine*, 591 A.2d at 194.

---

[8] *Accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on [Federal] Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

The District Court correctly recognized that the wrongful refusal analysis turns on whether the complaint "'allege[s] with particularity legally sufficient reasons to call into question the validity of the Board of Directors' exercise of business judgment'" in responding to a shareholder's demand.  SPA7 (quoting *Levner*, 903 F. Supp. at 457).  A board's decision to reject a shareholder's demand is reviewed under the "business judgment rule," which begins with the presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990); *see Levine*, 591 A.2d at 200, 209; *Scattered Corp. v. Chi. Stock Exch., Inc.*, No. CIV. A. 1040, 1996 WL 417507, at *3 (Del. Ch. July, 12, 1996) ("*Scattered I*") (a board's decision to reject a demand is assessed "under traditional business judgment rule standards").

A shareholder plaintiff can rebut this presumption by alleging particularized facts that, if true, raise a "reasonable doubt" that ***either***: (i) the board acted in good faith in responding to the demand; ***or*** (ii) the board acted reasonably and with due care in responding to the demand.  *See Scattered II*, 701 A.2d at 73; *Grimes*, 673 A.2d at 1219.  "Reasonable doubt" means "a reason to doubt." *Id.* at 1217. Although this burden to rebut the business judgment rule has been described as "considerable" (*see, e.g.*, *RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1328 (2d

Cir. 1991), it is not unsurmountable.[9]

In granting Defendants' motion to dismiss, the District Court incorrectly concluded that the allegations in Plaintiff's Complaint were "insufficient to overcome the presumption of the business judgment rule." SPA11. This erroneous conclusion was based on, among other reversible mistakes: (i) an erroneous application of Delaware law in giving complete deference to the Board's near total failure to investigate matters relating to the improper statements that were a material part – if not substantial focus – of the Demand; and (ii) a failure to consider the many particularized facts in the Complaint raising a reasonable doubt that the Board reasonably informed themselves about the improper statements before rejecting Plaintiff's Demand in that regard.

> **B.    The District Court Erroneously Applied a Legal Standard that Effectively Gave Complete Deference to the Board's Near Total Failure to Investigate the Material Portion of Plaintiff's Demand Concerning the Improper Statements**

The District Court applied a wrong standard that, in essence, gave total deference to the Board's decision on what matters to investigate in Plaintiff's

---

[9] *See, e.g.*, *City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1024 (N.D. Cal. 2013) (motion to dismiss denied); *Arnold ex rel. Chesapeake Energy Corp. v. McClendon*, No. CIV-11-986-D, 2012 WL 4483159, at *6 (W.D. Okla. Sept. 28, 2012) (motion to dismiss denied); *Behradrezaee v. Dashtara*, 910 A.2d 349, 363 (D.C. 2006) (motion to dismiss denied); *Stepak*, 20 F.3d at 410 (holding that plaintiff's "allegations raise a reasonable doubt about the reasonableness of the outside directors' efforts to inform themselves prior to rejecting [plaintiff's] demand").

Demand.  Due to this misapplication of the law, the District Court improperly afforded business judgment protection to the Board's near total failure to investigate and remedy the improper statements that were a material part – if not substantial focus – of Plaintiff's Demand.

The District Court tied its hands by selectively quoting and stringing together certain cases to form a lopsided standard that no plaintiff could ever overcome.  For example, the District Court stated that there is "'no prescribed procedure that a board must follow'" in responding to a demand, that there is no obligation to "'expressly address[] each and every issue'" raised in a demand, and that directors need not respond to a "demand letter 'point by point.'"  *See* SPA10-11 (quoting *Levine*, 591 A.2d at 214; *Mount Moriah Cemetery v. Moritz*, No. CIV.A. 11431, 1991 WL 50149, at \*3-4 (Del. Ch. Apr. 4, 1991); *Halpert Enters., Inc. v. Harrison*, No. 07-1144-CV, 2008 WL 4585466, at \*2 (2d Cir. Oct. 15, 2008) ("*Halpert II*"); *Gatz v. Ponsoldt*, No. CIV.A 174-N, 2004 WL 3029868, at \*5 & n.28 (Del. Ch. Nov. 5, 2004); *Baron v. Siff*, No. 15152, 1997 WL 666973, at \*3 (Del. Ch. Oct. 17, 1997)).  Applying this standard with little to no substantive analysis, the District Court ruled:  "Under these circumstances, it does not appear that the Board's investigation and analysis were unreasonable or conducted in bad faith, ***especially as there is no prescribed procedure or form a Board must follow when responding to a demand letter***."  SPA11.  Also telling, the District Court

30

failed to mention Delaware's "reasonable doubt" standard, although Plaintiff stated it in his briefing and at the hearing. *See, e.g.*, Vol. III, A521, A528, Vol. IV, A787:2-10.

Although it is true that the law does not dictate the specific procedures for investigating a shareholder demand, this does not mean that a board's investigation is beyond scrutiny and attack. *See* Vol. III, A532 ("Defendants suggest that the Review Committee and the Board had virtually unbridled discretion in selecting the scope of the investigation.… Not true."). The business judgment rule, after all, is a ***rebuttable*** presumption. *See supra* at VII.A. Moreover, "the business judgment rule 'has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act.'" *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) (quoting *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) *overruled on other grounds by Brehm*).

A board must act "on an informed basis" in responding to a shareholder's demand. *Levine*, 591 A.2d at 213; *Stepak*, 20 F.3d at 403. This means that corporate directors have a duty to inform themselves of "***all material information*** reasonably available to them." *Aronson*, 473 A.2d at 812; *Brehm*, 746 A.2d at 259 (concluding "that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, measured by concepts of gross negligence, included consideration of all material

31

information reasonably available").  Directors cannot, for example, exclusively rely on opinions or reports of others (including officers and experts) where "material and reasonably available" information was "so obvious that the board's failure to consider it was grossly negligent."  *Brehm*, 746 A.2d at 262.

The "reasonableness of the board's investigation of the claims articulated in the demand" is subject to court review.  *Scattered I*, 1996 WL 417507, at *3.[10] The efforts of directors to conduct an investigation and adequately inform themselves are judged under a "gross negligence" standard. *Halpert II*, 2008 WL 4585466, at *1 (citing *Smith v. Van Gorkom,* 488 A.2d 858, 873 (Del. 1985) *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009)). The District Court at least recognized – though failed to apply – this gross negligence standard.  *See* SPA11.

While boards are given "wide latitude" in how they investigate matters raised in shareholder demands, this discretion is not unfettered.  *Stepak*, 20 F.3d at 410.  As explained by the Eleventh Circuit, "even the most generous and forgiving

---

[10]  *Scattered I* is factually distinguishable because, in that case, the plaintiff challenged the good faith and reasonableness of an executive committee's investigation on three grounds, none of which Plaintiff has asserted in this case. *Scattered I*, 1996 WL 417507, at *4 ("The Complaint challenges the good faith and reasonableness of the Executive Committee's investigation on three grounds: (i) the Special Committee was formed in violation of 8 Del. C. §141(c) ... ; (ii) the defendants refused to disclose information requested by the plaintiffs to evaluate the good faith of the Executive Committee ... ; and (iii) the complained-of wrongful conduct continues to the present.") (internal citations omitted).

standard has its limits or it is no standard at all.  The Delaware Supreme Court has set the boundary at gross negligence."  *Id*.  Similarly, in *City of Orlando,* the Northern District of California acknowledged that the investigating committee was "not obligated to interview every potential witness identified by plaintiff," but found that plaintiff had "identified witnesses who should have been interviewed but were not."  970 F. Supp. 2d at 1032.  "[A]ny reasonable investigation of plaintiff's demand," the court concluded, should have included those interviews. *Id*.

The District Court's cited authorities, taken in proper context, are not contrary to these principles.  The cases merely demonstrate that nitpicking a board's process or attacking its investigation at the margins generally will not raise a reasonable doubt that the board was adequately informed in responding to a demand:

- In *Levine*, plaintiff contended that the board's ***failure to let the plaintiff "make an 'oral presentation'*** to the Board evidenced a lack of due care or unreasonable conduct."  591 A.2d at 214.

- In *Halpert II*, plaintiff argued the audit committee's investigation was unreasonable because the committee did not interview the twenty-four individual defendants and was advised by counsel in the current and prior derivative litigation.  2008 WL 4585466, at *2.

- In *In re Boston Scientific Corporation Shareholders Litigation*, plaintiffs argued that investigation and report of counsel retained by special committee did not include interviews or enough evidence, and the board should have met for more than one hour, although the special committee "had already undertaken ***extensive review***, with the benefit of outside

counsel."  No. 02 CIV 247 AKH, 2007 WL 1696995, at *6 (S.D.N.Y. June 13, 2007).

- In *Baron*, plaintiff raised various issues with the content and signing of the board's demand rejection letter, including that it did not "respond to ***each allegation*** in the demand letter," and because the rejection letter was "dated nine days after the demand letter" – though plaintiff effectively demanded a response within 10 days.  1997 WL 666973, at *2-3.

- In *Mount Moriah Cemetery*, the court refused to "second guess[]" the scope of the board's investigation where plaintiff primarily argued that the special committee did not interview enough people, did not review enough documents, and did not consider all aspects of the sales practices issue under investigation, and the board adopted the special committee's recommendation without adequate deliberation.  1991 WL 50149, at *3-4.

*Gatz* is particularly notable for confirming that a board must consider material information.  There, plaintiffs failed to raise requisite "reasonable doubt" where they quibbled over the independent committee's investigation on three grounds: (i) only two individuals were interviewed; (ii) the committee never learned of a certain transaction; and (iii) the committee did not issue a report.  2004 WL 3029868, at *5.  With regard to the undiscovered transaction, the court noted that plaintiffs failed to "allege why this fact was ***material***" to the independent committee's investigation.  *Id.*  The court reasoned: "How can one fault an investigator for not being aware of irrelevant facts?"  *Id.*

Here, Plaintiff does not merely nitpick the Board's investigation or attack it around the margins.  Rather, unlike the authorities relied upon by the District

Court, Plaintiff challenges the Board's investigation for, among other reasons, its near total failure to investigate and address the improper statements that were an obviously substantial focus of Plaintiff's Demand and concurrent government investigations. *See, e.g.*, Vol. I, A15 (¶13), A56-57 (¶113); Vol. III, A535-37; Vol. IV, A795:11-796:7, A804:17-805:4 ("The company, on its own timetable, before the conclusion of all of the regulatory actions, before the Senate committee had concluded its work, had determined on its own to address only specific aspects of our demand. Notably missing from that discussion is the rejection letter, and in the reports in January by the Task Force and Review Committee, are what occurred with respect to the disclosure mechanisms, what existed with respect to the internal controls that would have allowed J.P. Morgan, and did allow J.P. Morgan, to make its false and misleading statements in the first quarter of 2012. That ***fundamental problem*** with the board's review and rejection of our demand is what prompted our lawsuit, in addition to other matters."); *supra* at IV.D.

Stated another way, Plaintiff demanded that the Board investigate and remedy the acts or omission that caused the CIO's enormous trading losses ("Wrongdoing A") and the improper public statements regarding the trading losses ("Wrongdoing B"). Though closely related, they are different, treated as such in the Demand, and each given attention in various government investigations. *See, e.g.*, Vol. I, A69-70 (separately demanding determinations of responsibility and

35

specifically demanding "corporate governance measures to prevent future dissemination of improper statements"); Vol. IV, A801:17-802:1 (noting the disclosure issues "are at the crux and core" of recent government settlements and the Senate investigation).  While the Board made some efforts to investigate and remedy Wrongdoing A, it made no effort to investigate or fix Wrongdoing B, which was a material part of Plaintiff's Demand.  *See, e.g.*, Vol. III, A535-37 (explaining "near total failure of the Task Force and Review Committee, and therefore the Board, to investigate the improper statements Plaintiff identified in his Demand" and listing "obvious facts demonstrating the materiality of (and thus the need to investigate) the improper statements"); Vol. IV, A801:17-802:1 ("And those disclosure issues are fundamental to this entire set of circumstances.").  This constitutes an abdication of the Board's duties to investigate Wrongdoing B, which falls outside the protection of the business judgment rule.  *Rich*, 66 A.3d at 979 ("Here, the Plaintiff has pled facts with particularity that show that the … board has abdicated its responsibilities because the investigation has been left in limbo, with no progress, for several months. Under that view of the facts, … management is not entitled to the business judgment rule's protections."); *Aronson*, 473 A.2d at 813.

Notably, while the Dismissal Order recites the work done by the Board in its investigation related to the CIO's losses, it never identifies any specific efforts

made with regard to the improper statements. *See, e.g.*, SPA4-6, 9. The Court seemed to mistakenly believe that because the Board (relying on the Task Force and Review Committee) investigated Wrongdoing A, the business judgment rule would protect the Board's decision to entirely ignore Wrongdoing B. *See* SPA10-11. But no matter how thoroughly or extensively the Board may have investigated and addressed Wrongdoing A, under the clear standards discussed above, that cannot serve as a basis for excusing the Board from investigating the separate (though related) matter of Wrongdoing B.

This case, where the Board investigated Wrongdoing A but ignored Wrongdoing B, entails a different scenario requiring a different analysis than the District Court's cited authority in which the plaintiffs' demands concerned a particular set of wrongdoing and the board, at least to some reasonable degree, investigated that wrongdoing. The District Court erred as a matter of law in using the standard applicable to ***partial*** attacks on an investigation to justify its blind deference to the Board's ***near total*** failure to investigate the improper statements. Indeed, neither Defendants nor the District Court have produced any authority showing that when a shareholder demands that a Board examine and address two sets of wrongdoing, the Board can reject both without making any attempt to investigate or remedy both. Rather, the cases cited above, including *Gatz*, consistently say that if subject matter is material, a board must investigate it. 2004

37

WL 3029868, at *5. *Accord City of Orlando,* 970 F. Supp. 2d at 1032; *Aronson*, 473 A.2d at 812; *Brehm*, 746 A.2d at 259.

The District Court erred as a matter of law by failing to follow the correct standards applicable to the Board's failure to investigate the improper statements. The Dismissal Order must be reversed.

### C. The Particularized Allegations in the Complaint Raise a Reasonable Doubt that the Board Exercised Due Care and Good Faith in Responding to Plaintiff's Demand

In addition to misapplying legal standards, the District Court severely erred in assessing the legal sufficiency of Plaintiff's wrongful refusal allegations. The particularized allegations in the Complaint raise a reasonable doubt that the Board and its Review Committee conducted a good faith, reasonable investigation. The District Court erred by concluding otherwise. SPA8, 11. Whether under *de novo* review or an abuse of discretion standard, the Dismissal Order must be reversed and the Judgment vacated.

The Dismissal Order demonstrates that the District Court incorrectly assessed the particularized allegations in Plaintiff's Complaint. Most notably, the District Court repeatedly concluded that *all* of Plaintiff's wrongful refusal allegations were "conclusory." *See, e.g.*, SPA8 ("Plaintiff's contention that the Board acted in bad faith or conducted an unreasonable investigation rising to the level of gross negligence is *entirely conclusory*."); SPA9 (Plaintiff has offered *only conclusory allegations* that the Review Committee's investigation, and the

38

Board's subsequent refusal of Plaintiff's demand, rise to the level of "'gross negligence.'").  The actual, detailed content of the Complaint and the attachments thereto demonstrate quite the opposite.

The Board's failure to investigate the improper statements is possibly the best example of a particularized fact raising a reasonable doubt that the Board exercised proper business judgment in rejecting Plaintiff's Demand.   As Plaintiff stated in his opposition to Defendants' motion to dismiss:

> Perhaps the most glaring demonstration of a systematic effort to shield defendant Dimon and the other Individual Defendants from blame was the near total failure of the Task Force and Review Committee, and therefore the Board, to investigate the improper statements that Plaintiff identified in his Demand and that gave rise to the ERISA and securities class actions, as well as government investigations.

*See* Vol. III, A535 (citing Complaint).

The Complaint alleges, for example, that "the Review Committee never even evaluated potential liability for certain of the defendants' false and misleading statements," that "[n]umerous government entities, including the Senate Subcommittee and the SEC, have focused on the culpability arising from these improper statements," that the "Company is subject to a pending Securities Class Action that alleges that these statements caused over $31 billion in damages to investors"; and, therefore,"the Review Committee and the Board did not act on the basis of all reasonably available information and ignored plaintiff's specific demand to investigate the false and misleading statements."  Vol. I, A57 (¶113),

*see also* Vol. I, A15 (¶13) ("[W]hereas the Senate Subcommittee's investigation revealed certain of the Individual Defendants' efforts to mask the CIO's troubled trading positions from investors and regulators, both the Task Force and the Review Committee *completely disregarded and failed to investigate any improper statements* whatsoever."); Vol. I, A45-47 (¶¶85-90) (discussing various lawsuits and government investigations).

These particularized allegations, in of themselves, are sufficient to establish that the issues regarding the false statements were material, that the Board (relying on the Task Force and Review Committee) nonetheless did not investigate those issues, and, as a result, the Board did not exercise valid business judgment.  It is absurd – and reversible error – to require a plaintiff to somehow plead with further detail a negative like a board's failure to investigate a matter.  *See Aronson*, 473 A.2d at 816 ("[T]he plaintiff need only allege specific facts; he need not plead evidence."); *Brehm*, 746 A.2d at 254 ("What the pleader must set forth are particularized factual statements that are essential to the claim. Such facts are sometimes referred to as 'ultimate facts,' 'principal facts' or 'elemental facts.'").

Yet Plaintiff went further than necessary, showing how other facts in the record confirmed that the Board did not investigate the improper statements. Plaintiff explained how the Task Force's report – substantially relied upon by the Board – was fatally flawed because it did not address the improper statements.

Vol. III, A535-37; Vol. I, A15 (¶113), A54 (¶109).  Indeed, the Task Force, the Review Committee, and the Board all failed to make corporate governance changes and take other steps to remedy the improper statements as Plaintiff demanded.  *See, e.g.*, Vol. I, A69-70.  ***None*** of the remedial relief discussed in the Task Force report directly relates to or addresses improper public statements.  Vol. III, A537.  Nor have Defendants pointed to any remedial steps the Board has taken – particularly corporate governance reforms – to address the improper statements. *See* Vol. III, A537; Vol. I, A118-19.  And a Form 8-K improperly submitted by Defendants does not show that defendant Dimon has been penalized in any way for his improper statements.  *See* Vol. III, A537; Vol. II, A260 (stating only that the Board considered "both the continued strong performance of the Firm, and ***the CIO losses***, including Mr. Dimon's responsibility as the Firm's Chief Executive Officer").[11]  Furthermore, Plaintiff rebutted Defendants' argument that a discussion

---

[11] The District Court misstated Plaintiff's arguments regarding the Board's failure to remedy the improper statements.  According to the District Court, "Plaintiff argues that the Board, in refusing his demand, ***should not have considered*** the remedial measures that JPMorgan already had implemented in response to CIO's losses…."  SPA10 n.7.  Not true.  The Court took out of context and misconstrued an argument in Plaintiff's Complaint that the late adoption of necessary reforms does not absolve the Individual Defendants of liability.  *Id.* (citing Vol. I, A57 (¶114)).  That argument concerns the improperness of the Board's failure to pursue claims against the Individual Defendants for the matters purportedly remediated by corporate governance changes.  Those remediated matters, of course, did not include issues relating to the false statements, which the Board ignored in responding to Plaintiff's Demand.  The fact that the Company has taken some steps to remediate issues with the CIO's trading losses is irrelevant for purposes of

in the Task Force report regarding defendant Dimon's knowledge about the CIO's losses could somehow substitute for an investigation into the improper statements. Vol. III, A535 n.19.

Moreover, Plaintiff identified for the Court various material facts demonstrating that the Individual Defendants' improper statements were a subject requiring "careful consideration" yet received almost no attention by the Task Force, the Review Committee, or the Board.  Vol. III, A536-37 (citing *Brehm*, 746 A.2d at 262; *Scattered I*, 1996 WL 417507, at *5) (quote marks omitted).[12]  At the

---

whether the Board investigated and remedied issues relating to the improper statements.

[12] These material facts include: (i) on two occasions between June 2011 and August 2011, the SEC sent letters to defendant Braunstein warning JPMorgan to increase its investor disclosures on proprietary trading (*see, e.g.*, Vol. I, A47 (¶90)); (ii) beginning in April 2012, U.S. senators began publicly investigating and criticizing the improper statements (*see, e.g.*, Vol. I, A45-47 (¶¶87-89)); (iii) numerous other governmental entities, including the SEC, were conducting their own investigations regarding the improper statements (*see, e.g.*, Vol. I, A45 (¶85), A56-57 (¶113)); (iv) Plaintiff made his Demand in May 2012 identifying false statements, the Individual Defendants' involvement therewith, and demanding the Board "determine which Company employees, officers, and/or directors, current or former, were responsible for dissemination of the materially false/misleading statements and omissions regarding the risk exposure" and "implement corporate governance measures to prevent future dissemination of the improper statements" (*see, e.g.*, Vol. I, A64-70); (v) since May 2012, the Company has been named as a defendant in securities fraud class action lawsuits arising from the improper statements, in addition to class action lawsuits brought under the Employee Retirement Income Security Act (*see, e.g.*, Vol. I, A45 (¶86), A50 (¶98), A56-57 (¶113)); and (vi) since at least July 13, 2012, the Company knew it would have to issue a large restatement due to the Company's losses from the CIO's synthetic-

hearing, Plaintiff's counsel presented the Court with a similar timeline of critical events highlighting that the Board should have known that the improper statements were a significant issue that needed to be investigated and remedied.  *See, e.g.*, Vol. IV, A787-95 (setting forth timeline of government investigations and other matters relating to the improper statements that Board should have been aware of before it rejected Plaintiff's Demand); Vol. IV, A795:11-796:7, A797:4-798:25, A800:9-802:1, A804:11-805:4.   Indeed, the District Court acknowledged its awareness of those facts.  Vol. IV, A794:9 ("We are all aware of those facts.").

The allegations in the Complaint, consistent with the rejection letter attached thereto and the various documents Defendants brought into the record, establish that the Board did not investigate the material issues regarding the improper statements.  This is more than enough to raise a reasonable doubt that the Board did not adequately inform itself in responding to the Demand, if not outright abdicated its responsibilities.

In addition to the facts regarding the Board's failure to investigate the improper statements, Plaintiff also identified numerous other problems with the Board's and the Task Force's investigations that raise further reasons to doubt that the Board rejected the Demand in good faith and with due care.  *See, e.g.,* Vol. III,

---

credit positions, which, by October 15, 2012, had ballooned to over $6.25 billion (*see, e.g.*, Vol. I, A41-42 (¶¶77-78)).

A528-35.    These problems, which show that the process for responding to Plaintiff's Demand was destined from the beginning to deflect blame away from defendant Dimon and the Board, include: (i) the disregard of defendant Dimon's responsibility for secretly transforming the CIO from a risk management unit to a proprietary trading desk (*see* Vol. III, A532, A534-35); (ii) the unreasonably narrow time period of wrongdoing investigated (*see* Vol. III, A533); and (iii) the lack of independence on part of the Review Committee and the Task Force, led by defendant Dimon's close confidant defendant Cavanagh (*see* Vol. III, A529-31).

The particularized allegations in the Complaint concerning the unreasonableness of the Board's investigation are anything but "conclusory."  The Complaint alleges, for example, that the Board failed to investigate the improper statements although the Board had plenty of reasons to know the improper statement issue was material.  This is reason enough to doubt that the Board exercised due care and good faith in responding to Plaintiff's Demand.  And the allegations in the Complaint are bolstered by materials submitted (some improperly) at the pleadings stage by Defendants.  If Plaintiff was granted leave to amend his Complaint as he requested in the event of dismissal, he could have included these additional supporting facts.  Thus, the Court's dismissal of the case and immediate entry of judgment was reversible error.

44

## VIII. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING PLAINTIFF AN OPPORTUNITY TO AMEND

Although Plaintiff had requested an opportunity to amend his Complaint if the District Court granted Defendants' motion to dismiss (*see* Vol. III, A542-43), the District Court dismissed Plaintiff's original and only Complaint "in its entirety" and immediately entered judgment against Plaintiff. *See* SPA11-12. This constituted a denial of leave to amend,[13] and was an abuse of discretion, because: (i) Plaintiff was never afforded a single opportunity to amend his Complaint; (ii) Plaintiff requested leave to amend; and (iii) the record established substantial, additional facts (many of which came to light after Plaintiff commenced this action) that support the allegations in the Complaint and rectify the District Court's basis for dismissal – namely, that Plaintiff failed to plead wrongful refusal with adequate particularity.

Denial of leave to amend is generally reviewed for an abuse of discretion. *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011); *Starr*, 592 F.3d at 321.

A court "should freely give leave" to amend "when justice so requires." Federal Rule 15. This "permissive standard" is consistent with the Second Circuit's

---

[13] As articulated by this Court, "if the district court had intended that the plaintiff be given an opportunity to amend her complaint, the order should have clearly granted leave to replead." *Elfenbein*, 590 F.2d at 450.

"'strong preference for resolving disputes on the merits.'"  *Williams*, 659 F.3d at

212-13 (quoting *New York v. Green,* 420 F.3d 99, 104 (2d Cir. 2005)).  *Accord ITT*

*Corp.*, 588 F. Supp. 2d at 515-16 ("When a motion to dismiss is granted, the usual

practice is to grant leave to amend the complaint." (citing *Ronzani v. Sanofi S.A.,*

899 F.2d 195, 198 (2d Cir. 1990))). Leave may be withheld only under limited

circumstances, such as where the proposed amendment would be "futile."

*Williams*, 659 F.3d at 214.

Consistent with these principles, many of the cases – including those cited

by the District Court or Defendants – reflect that plaintiffs were given an

opportunity (if not multiple opportunities) to amend their complaints.  Vol. III,

A542; *see, e.g.*, *In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.*,

773 F. Supp. 2d 330, 350 (S.D.N.Y. 2011) (denying plaintiff's "requests that the

Court stay this action for an indeterminate amount of time and then grant her leave

to replead her complaint a *fourth* time") (emphasis in original); *ITT Corp.*, 588 F.

Supp. 2d at 515-16 (granting leave to amend even though plaintiffs "may face an

uphill battle in remedying [the] defects by amending" their derivative complaint);

*Boston Scientific*, 2007 WL 1696995, at *1 (dismissing "Second Verified

Consolidated Amended Complaint"); *Baron*, 1997 WL 666973, at *4 (granting

plaintiff leave to amend within sixty days); *Aronson*, 473 A.2d at 808 (reversing

and remanding "with instructions that plaintiff be granted leave to amend the complaint").

This policy to allow at least one amendment makes sense given the complexity of typical fiduciary duty claims and the difficulty of pleading pursuant to Federal Rule 23.1 or Chancery Rule 23.1. *See ITT Corp.*, 588 F. Supp. 2d at 515-16 ("Granting leave to amend is especially appropriate when a complaint is dismissed for lack of specificity." (citing *In re Take-Two Interactive Sec. Litig.,* 551 F. Supp. 2d 247, 312-13 (S.D.N.Y.2008))). In fact, in a shareholder derivative action similarly dismissed by the district court for a purported failure to satisfy with Federal Rule 23.1, this Court advised that "the ideal disposition in cases such as these is to grant leave to replead within a specified time period, with a direction to the clerk to enter judgment if no amended complaint is forthcoming." *Elfenbein*, 590 F.2d at 449-50 (noting that "on facts such as these," the "preferable disposition" would have been for an order to be issued clearly granting leave to replead).

Despite the fact that this case involves complex facts and issues – even for a derivative action – and the fact that the District Court dismissed the Complaint "for lack of specificity" (*ITT Corp.*, 588 F. Supp. 2d at 515-16), Plaintiff was never given the opportunity to amend his first and only Complaint. Moreover, Plaintiff expressly requested leave in the event that the Court dismissed the Complaint.

47

Under these circumstances, leave should have been freely given. *See* Federal Rule 15. The District Court abused its discretion by implicitly denying Plaintiff's request.

This abuse of discretion is further established by the numerous and substantial facts that were highlighted to the Court, most of which came to light after Plaintiff initiated this case, and which demonstrate amendment would not be futile. For example, in requesting leave to amend, Plaintiff identified to the District Court many matters that could be addressed with an amended complaint. Plaintiff identified: (i) materials Defendants introduced with their motion to dismiss; (ii) substantial developments in the context of government prosecutions; (iii) extensive additional detail that could be gleaned from related cases; and (iv) additional facts regarding defendant Cavanagh's lack of independence and the Task Force's investigation, including sharp criticism by analysts. *See, e.g.*, Vol. III, A542-43.

At the motion to dismiss hearing, Plaintiff's counsel also identified developments in related government investigations. Counsel discussed, for example, how on September 19, 2013, JPMorgan entered consent orders with the SEC, the Federal Reserve, the OCC, and the FSA requiring JPMorgan to pay $920 million in fines, $200 million of which was payable to the SEC. Vol. IV, A792:11-23. As noted, the "SEC specifically found specific disclosure failures by senior

48

management," including defendants Dimon and Braunstein.   Vol. IV, A792:23-794:2.[14]   Defendants also provided the court with documents pertaining to these settlement agreements.   *See* Vol. III, A572.   Similarly, Defendants later submitted to the District Court a consent order entered between the CFTC and JPMorgan pursuant to which JPMorgan admitted to the findings articulated by the CFTC and agreed to pay a civil penalty of $100 million for violating the Commodity Exchange Act.[15]   *See generally* Vol. III, A818-37.

---

[14] *See e.g.*, Vol. III, A576, A579-80 ("[A]s to the information that was escalated, JPMorgan Senior Management did not make a considered assessment as to whether critical facts existed—including any significant deficiency or material weakness in internal controls—that had to be disclosed to the Audit Committee."), A589 ("However, while JPMorgan Senior Management was informed of, and was addressing, various issues with internal controls at CIO-VCG, JPMorgan Senior Management did not engage in a considered assessment, before the firm filed its first quarter report on May 10, 2012, to determine if these matters constituted a significant deficiency or material weakness in the firm's internal control over financial reporting and therefore had to be disclosed to the firm's Audit Committee. Nor, more broadly, did JPMorgan Senior Management disclose to the Audit Committee its concerns regarding the operation of CIO-VCG."), A596 (admitting to failure of senior management to make a considered assessment of whether critical facts existed).

[15] The CFTC's findings included that "JPMorgan imposed no limits on the notional size of trades for the SCP and had ***no system for monitoring limits on an intraday basis*** during the first quarter of 2012"; and that "JPMorgan's ***governing body did not receive a single notification*** regarding the size of or the risks imposed by the SCP during the first quarter of 2012 – and it only received a notification as to certain of the risks thereafter because the press began calling the firm in preparation for publication of a new report of the JPMorgan 'London Whale.'" Vol. IV, A827-28.

Amendment would hardly be futile in light of the host of additional facts. These and the other new facts that have come to light and were brought to the District Court's attention help show, among other things, that the improper statements were a material component of Plaintiff's Demand and as such could not reasonably be ignored by the Board, as well as show in general that the Board's investigation was unreasonable and conducted in bad faith. *See, e.g., supra* at 40-43. In other words, there are substantial particularized facts that Plaintiff could add to his Complaint to raise a reasonable doubt that the Board exercised valid business judgment in deciding to reject Plaintiff's Demand. This would remedy the purported defect determined by the District Court that the allegations in the Complaint were somehow all conclusory (*see, e.g*., SPA8-9) and insufficient to satisfy Federal Rule 23.1 and Chancery Rule 23.1.

Therefore, to the extent dismissal of the Complaint was appropriate, the District Court abused its discretion by denying Plaintiff an opportunity to amend.

## IX.    CONCLUSION

For the foregoing reasons, Plaintiff respectively requests that this Court reverse the District Court's Dismissal Order in its entirety and vacate the Judgment, or, in the alternative, mandate that Plaintiff be granted leave to amend his Complaint.

Dated:  August 27, 2014          Respectfully submitted,

ROBBINS ARROYO LLP


*/s/ George C. Aguilar*
George C. Aguilar
Jay N. Razzouk

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsarroyo.com
jrazzouk@robbinsarroyo.com

LAW OFFICES OF
   THOMAS G. AMON
Thomas G. Amon
250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427
tamon@amonlaw.com

*Counsel for Plaintiff-Appellant Ernesto Espinoza*

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,079 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using MicroSoft Word 2010 in 14-point Times New Roman.


Dated: August 27, 2014                    */s/ George C. Aguilar*
                                                George C. Aguilar
                                                ROBBINS ARROYO LLP
                                                600 B Street, Suite 1900
                                                San Diego, CA 92101
                                                Telephone: (619) 525-3990
                                                Facsimile: (619) 525-3991
                                                gaguilar@robbinsarroyo.com

## <u>CERTIFICATE OF SERVICE</u>

I, George C. Aguilar, hereby certify that on August 27, 2014, I caused Plaintiff-Appellant Ernesto Espinoza's Brief and Special Appendix to be electronically filed with the Clerk of the District Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.  I further certify that the aforementioned was thereby served on all counsel of record in this action through this Court's CM/ECF filing system.

Dated: August 27, 2014

*/s/ George C. Aguilar*

George C. Aguilar
ROBBINS ARROYO LLP
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
gaguilar@robbinsarroyo.com

# SPECIAL APPENDIX

# INDEX OF DOCUMENTS

**Document**                                                                                     **Page**

Memorandum Decision and Order (filed Mar. 31, 2014)................................. SPA1

Judgment (filed Mar. 31, 2014), Appealed From ........................................... SPA12

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ERNESTO ESPINOZA, Derivatively on Behalf
of JPMORGAN CHASE & CO.,

Plaintiff,

v.

JAMES DIMON, DOUGLAS L.
BRAUNSTEIN, MICHAEL J. CAVANAGH,
ELLEN V. FUTTER, JAMES S. CROWN,
DAVID M. COTE, LABAN P. JACKSON, JR.,
CRANDALL C. BOWLES, JAMES A. BELL,
LEE R. RAYMOND, STEPHEN B. BURKE,
WILLIAM C. WELDON, INA R. DREW,
WILLIAM H. GRAY, III, and DAVID C.
NOVAK,

Defendants,
-and-
JPMORGAN CHASE & CO., a Delaware
corporation,

Nominal Defendant.

MAR 3 1 2014

MEMORANDUM DECISION AND
ORDER

13 Civ. 02358 (GBD)
(Derivative Action)

GEORGE B. DANIELS, United States District Judge:

This verified shareholder derivative action is brought by Plaintiff Ernesto Espinoza

("Plaintiff"), a shareholder of JPMorgan Chase & Co. ("JPMorgan" or the "Company") on behalf of

nominal defendant JPMorgan against certain of its officers and directors for breaches of fiduciary duty,

waste of corporate assets, and unjust enrichment. Compl. ¶¶ 118-136. In his complaint, Plaintiff

Espinoza challenges the JPMorgan Board of Directors' refusal to pursue claims based on the so-called

"London Whale" trading losses suffered in 2012 by a London-based portfolio managed by JPMorgan's

Chief Investment Office ("CIO"), and names sixteen individual Defendants.[1]

---

[1] James Dimon, Douglas L. Braunstein, Michael J. Cavanagh, Ellen V. Futter, James S. Crown, David M. Cote, Laban P.
Jackson, Jr., Crendall C. Bowles, James A. Bell, Lee R. Raymond, Stephen B. Burke, William C. Weldon, Ina R. Drew,
William H. Gray, III , and David C. Novak.

1

Defendants filed a Motion to Dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Docket No. 20. Defendants' motion to dismiss is GRANTED.[2]

## Background[3]

**I.    The Parties**

Nominal Defendant JPMorgan is a global financial services firm incorporated in Delaware. Compl. ¶ 19. Plaintiff is a JPMorgan shareholder that continuously held Company stock since October 1, 2009. The Director Defendants are nine current and two former outside directors of JPMorgan. Dimon, JPMorgan's Chairman and CEO, is the only JPMorgan officer who serves on the Board. The other Officer Defendants are a Vice Chairman of JPMorgan and former CFO (Braunstein), a co-CEO of the Corporate Investment Bank (Cavanagh), and the former Chief Investment Officer (Drew). Id. ¶¶ 21-22, 32.

**II.    Plaintiff's Demand on the Board**

On May 23, 2012, Plaintiff made a demand on JPMorgan's Board to "investigate, address, and commence proceedings against certain officers, employees, and directors of the Company for violations of any applicable laws" concerning their responsibility for JPMorgan's "failed hedging strategy," lack of "adequate risk exposure and internal financial controls," and "dissemination of the materially false/misleading statements and omissions regarding the risk exposure." Compl. ¶ 102. Plaintiff contended that "CIO was taking positions in credit default swaps and other synthetic credit derivative instruments that did not hedge against its investment exposure, but were to generate riskier short-term profits." Id. at 2. In his letter, Plaintiff identified Dimon, Braunstein, Drew and CIO trader Bruno Iksil (the London-based trader referred to as the "London Whale" in certain press reports) as

---

[2] Three shareholder derivative actions were filed in this Court, two of which were consolidated. See Baker v. Dimon, No. 12-3878 (S.D.N.Y. May 15, 2012); Wayne Cnty. Emps. Ret. Sys. v. Dimon, No. 12-7313 (S.D.N.Y. Sept. 28, 2012). The consolidated action was dismissed on the basis that the Plaintiff failed to make sufficient allegations that demand of the Board would have been futile. See Baker v. Dimon, No. 12-3878 at ECF No. 53.

[3] The following factual allegations are taken from the Complaint (or documents attached to it or incorporated by reference) and are deemed to be true for the purposes of a motion to dismiss. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

supposed "culpable parties," along with the other Director Defendants who allegedly "failed to maintain adequate risk management guidelines and internal financial controls." Id. at 4-5.

Plaintiff demanded that the Board "undertake an investigation of the wrongdoing detailed herein through a committee of the Board consisting of independent and disinterested directors with the assistance of independent outside legal counsel." Id. at 5. He also insisted that the Company (i) "initiate legal proceedings against those responsible for the wrongdoing and misconduct;" (ii) "claw-back" salaries and bonuses from those employees responsible for CIO's losses; and (iii) "implement corporate governance measures." Id. at 5-6.

## III. The Review Committee

On May 23, 2012, JPMorgan's Board created a Review Committee consisting of three outside (non-management) directors to, among other tasks, examine the issues raised in Plaintiff's and other similar shareholder demands and complaints and recommend to the Board what action should be taken. Compl. Ex. D at 2 (1/16/13 Form 8-K). The Review Committee was chaired by JPMorgan's Presiding Director Lee Raymond, retired Chairman and CEO of Exxon Mobil; the other two members of the committee were Laban Jackson, Chairman of the Board's Audit Committee, and William Weldon, Chairman of the Board's Corporate Governance Committee. The Review Committee retained Robert Mundheim, former General Counsel of the U.S. Department of the Treasury, and Mr. Mundheim's law firm, Sherman & Sterling LLP, to act as its counsel. Compl. Ex. G at 1. The Review Committee's counsel also hired James P. Healy, CEO of Capra Ibex Advisors, LLC and the former Global Head of the Fixed Income Division at Credit Suisse, as an expert advisor to assist with the analysis of CIO's trading activities in London. Compl. Ex. G at 1. On July 12, 2012, Mr. Munheim informed Plaintiff that the Board had established a Review Committee, to "investigate, among other things, the matters and proposed actions referred to in [Plaintiff's] Demand." Compl. ¶ 106. The Board asked the Review Committee to (i) conduct its own thorough investigation of CIO's losses, (ii) review the scope of and

3

**SPA3**

oversee the separate ongoing investigation of those losses by the management Task Force, (iii) review

and, as appropriate, modify remedial actions recommended by the Task Force, (iv) oversee

implementation of those remedial actions, and (v) assess JPMorgan's risk management process "as it

relates to the issues raised in the CIO Task Force review." 5/23/12 Board Resolution at 4. The Board

Resolution provided that the Review Committee would "oversee the scope and conduct of the

Company's Management Task Force review relating to the CIO losses and, as appropriate, modify or

supplement conclusions and recommended remedial actions arising from the Management Task Force

review." Compl. ¶ 107.

## IV.    The Review Committee's Investigation and Report

Over the course of eight months, the Review Committee "undertook an extensive investigation

and analysis of the matters related to CIO and the losses, and also considered matters relating to risk

management and other control functions at the Company generally." Compl. Ex. G at 1. With the

assistance of outside counsel, the Review Committee, among other things, (i) electronically searched

over 21 million electronic and hard-copy documents and analyzed approximately 300,000 documents,

(ii) separately conducted 22 interviews of current and former JPMorgan employees, officers and

directors, (iii) participated in another 22 interviews of JPMorgan personnel organized by the Task

Force, (iv) met with regulators and surveyed best practices, (v) reviewed Board and Board committee

materials, and (vi) "[r]eviewed and commented on remediation steps being implemented at the

Company." Id. at 1-2. The Review Committee also "held 13 formal meetings, plus numerous informal

discussions and telephone conferences among members of the Committee and with counsel and the

Committee's expert advisor," and it "reported to the other non-management Directors on its work at

several Board meetings from June 2012 through January 2013." Id.

In addition, the Review Committee concurrently oversaw the "scope and conduct" of the

separate investigation of CIO's losses conducted by the JPMorgan Management Task Force and its

4

**SPA4**

separate counsel. The Task Force's review "included a significant number of interviews of current and former JPMorgan employees, and an examination of millions of documents and tens of thousands of audio files." Task Force Report at 1. Throughout its review, the Task Force "shared and discussed [its] observations with the Review Committee...as well as the full Board." Id. The Task Force ultimately issued a 129-page report on January 16, 2013 addressing the causes of CIO's 2012 losses and the "comprehensive remedial measures the Firm has undertaken" in response to those losses. Id. The Review Committee expressly "concur[red] in the substance of" the Task Force Report. Review Committee Report at 2.

## V.     The Board's Refusal of Plaintiff's Demand

At a January 15, 2013 meeting of JPMorgan Board, the Review Committee, following Dimon's excusal from the meeting, formally presented its conclusions and recommendations to the Company's non-management directors. 1/15/13 Board Resolution. The Review Committee recommended that (i) no litigation be brought in connection with CIO's losses and (ii) JPMorgan seek the dismissal of the pending shareholder derivative actions. Id. at 9. After discussing the Review Committee's conclusions and recommendations, "the non-management directors, in the exercise of their business judgment, determined that it was not in the best interests of the Company to initiate litigation against any former or current employees, officers, or directors of the Company and rejected the demand." Compl. Ex. G at 2. In arriving at this unanimous decision, the Board considered numerous factors, including:

> The "remedial actions already taken by the Company with the oversight and input of the Board," including the "creation and support of the Management Task Force;" the "revamping of CIO's mandate, leadership, staffing, governance, and processes;" and the "measures taken to enhance risk management throughout the Company" (id. at 3);
>
> The "clawbacks" of the maximum permissible amount of previously awarded incentive compensation from the CIO personnel with managerial or direct responsibility for the trading that resulted in the losses, which amounted to "approximately two years' worth of each individual's total compensation" (id. at 3; Task Force Report at 106);

5

The "significant reduction" in incentive compensation of members of both senior JPMorgan management and CIO management, including a 53.5% reduction in Mr. Dimon's 2012 incentive compensation and a 51.4% reduction in Mr. Braunstein's 2012 incentive compensation (Compl. Ex. G at 3; 1/16/13 Form 8-K at 2; 2013 Proxy Statement at 20);

The departures or reassignments of certain members of senior management and CIO personnel (Compl. Ex. G at 3);

The results of the Review Committee's and the Task Force's separate investigations (id.);

The "conclusions and recommendations in the Board Review Committee Report, including measures to enhance Board oversight" (id.).

On February 5, 2013, Defendant Raymond, Chairman of the Review Committee, sent a letter to Plaintiff rejecting the Demand and stating that the Review Committee "concurred in the substance of the Company's Management Task Force Report dated January 16, 2013…" Compl. ¶ 111.

## Standard of Review

Derivative lawsuits must meet "a pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)." Fink v. Weill, 2005 U.S. Dist. LEXIS 20659, at *9 (S.D.N.Y. 2005), citing Fed. R. Civ. P. 23.1. Though a complaint may plead a "conceivable" allegation that would survive a motion to dismiss under Rule 12(b)(6), "vague allegations are ... insufficient to withstand a motion to dismiss pursuant to Rule 23.1." McPadden v. Sidhu, 964 A.2d 1262, 1269 (Del. Ch. 2008). In such cases, "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1.

Although Fed. R. Civ. P. 23.1 outlines the procedural rules with which a derivative action in federal court must comply, state law provides the substantive law governing a Board's refusal of a demand. See Levner v. Prince Alwaleed Bin Talal Bin Abdulaziz Al Saud, 903 F. Supp. 452, 455 (S.D.N.Y. 1994), citing RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991); see also

6

Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 108-09 (1991); Halpert Enters, Inc. v. Harrison, 362 F. Supp. 2d 426, 430 (S.D.N.Y. 2005).[4]  As the parties agree, because JPMorgan is a Delaware corporation, the sufficiency of the Derivative Plaintiff's demand futility allegations is analyzed under Delaware law.  See Opp'n at 4, see also Defs' Mem. at 10; Halpert Enters., Inc. v. Harrison, 2008 WL 4585466 (2d Cir. Oct. 15, 2008).

### Business Judgment Rule

A board's decision to reject a demand is entitled to the benefit of the business judgment rule.  See, e.g., Levine v. Smith, 591 A.2d 194, 209 (Del. 1991), overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del.2000).  The business judgment rule presumes that the board made its decision "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  Spiegel v. Buntrock, 571 A.2d 767, 774 (Del. 1990).  To demonstrate that the board's refusal of a demand was wrongful, "the shareholder plaintiff is required to allege with particularity legally sufficient reasons to call into question the validity of the Board of Directors' exercise of business judgment."  Levner, 903 F. Supp. 452, 457 (S.D.N.Y.1994) (internal quotation marks and citations omitted).  Under Delaware law, the directors' decision "will be shielded by the business judgment rule unless the shareholder plaintiff can carry the considerable burden of showing that the decision not to bring the lawsuit was made in bad faith or was based on an unreasonable investigation."  RCM Sec. Fund, Inc. v. Stanton, 928 F.2d at 1328.  The RCM Court noted that few, if any, plaintiffs surmount this obstacle.  Id.; see also FLI Deep Marine LLC v. McKim, C.A. No. 4138–VCN, 2009 WL 1204363, at *3, 2009 Del.Ch. LEXIS 56, at *8 (Del.Ch.2009)

---

[4] Chancery Rule 23.1 is "either identical to or consistent with the principles behind Federal R. Civ. P. 23.1."  Levner, 903 F. Supp. at 456 n. 4 (S.D.N.Y. 1994).  See also Allison on Behalf of G.M.C. v. General Motors Corp., 604 F. Supp. 1106, 1116 n. 11 (D. Del.1985) ("In practical terms, it is important that the result of applying Chancery Rule 23.1 is the same as the application of Fed. R. Civ. P. 23.1.  It would be disquieting if a derivative plaintiff suing a Delaware corporation could achieve a different answer as to whether demand is excused as futile simply by filing, quite literally, 'across the street' in Chancery Court."), aff'd, 782 F.2d 1026 (3d Cir. 1985).  Accordingly, cases interpreting both standards are equally applicable to the instant question.

("[W]here a shareholder's demand has been refused, this Court only examines the good faith and reasonableness of the board's investigation.").

Plaintiff's arguments concerning the purported lack of independence of the three non-management directors on the Review Committee and the other seven non-management directors is easily dispensed with. See Compl. ¶ 112. It is well-established that "where a shareholder instead chooses to make a demand upon a board of directors, she concedes the independence of a majority of the board." FLI Deep Marine LLC v. McKim, 2009 WL 1204363, at *3 ("The Plaintiffs in this action made presuit demand on DMT's board of directors. As a result, they have conclusively conceded the independence of the Board, and are precluded from now arguing that demand should be excused because the directors are conflicted."). Accordingly, there is no merit to the allegation that the Board's refusal was wrongful because its members were not independent.[5] The remainder of the Complaint's allegations on this issue fail to satisfy the requirements of Rule 23.1(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 23.1(b)(3); see also Levner, 903 F. Supp. at 457 ("In a shareholder derivative suit, in order to conform to the requirements of Rule 23.1, the shareholder plaintiff is required to allege with particularity 'legally sufficient reasons to call into question the validity of the Board of Directors' exercise of business judgment.'") (quoting Allison on behalf of General Motors Corp. v. General Motors Corp., 604 F. Supp. at 1121).

Plaintiff's contention that the Board acted in bad faith or conducted an unreasonable investigation rising to the level of gross negligence is entirely conclusory. Plaintiff asserts that JPMorgan's Board "did not act…reasonably, and in good faith on the basis of all reasonably available information" in refusing his demand. Compl. ¶ 115; see also Opp'n at 2, 6-7, 16-19. Plaintiff has alleged no facts with the requisite particularity to overcome the presumption of the business judgment rule and create a reasonable doubt as to the "good faith" or "reasonableness" of the Board's

---

[5] In a related decision issued today, this Court specifically provides a full discussion regarding the Board's independence. See Baker v. Dimon, 12 Civ. 3878, ECF No. 53 at 12-13.

8

**SPA8**

investigation into whether J.P. Morgan should sue its directors.[6] Defendants point to the fact that over the course of eight months, the Review Committee, with the assistance of separate outside counsel and an expert advisor, (i) conducted or participated in over 40 interviews of current and former JPMorgan employees, officers and directors, (ii) electronically searched over 21 million electronic and hard-copy documents and analyzed approximately 300,000 documents, (iii) reviewed information provided by the JPMorgan management Task Force, (iv) reviewed Board and Board committee materials, (v) met with regulators, (vi) collected and reviewed relevant news reports, (vii) surveyed best practices, and (viii) reviewed and commented on remediation efforts implemented by the Company. Defs' Mem. at 20; citing Compl. Ex. G. at 1-2. Defendants note as well that Plaintiffs must allege facts showing "gross negligence" by the Board when it refused Plaintiff's demand. Defs' Mem. at 3 (citing Halpert, 2008 WL 4585466, at *1) ("The standard by which the directors' actions in conducting an investigation and seeking to inform themselves adequately are to be judged is gross negligence.").

The Review Committee's actions, on their face, appear to be presumptively "reasonable" and in good faith and went far beyond what was necessary to provide the Board with "an informed basis [for] rejecting the derivative plaintiff's demand." In re Boston Sci. Corp. S'holders Litig., 2007 WL 1696995, at *5 (S.D.N.Y. June 13, 2007). Defendants correctly note that lesser investigations have routinely been held to be reasonable. See, e.g., Boston Sci., 2007 WL 1696995, at *5 (not unreasonable for review committee to rely on report of committee's counsel prepared "without the benefit of any interviews, relying only upon the evidence already gathered in" prior litigation); Gatz v. Ponsoldt, 2004 WL 3029868, at *5 (Del. Ch. Nov. 5, 2004) (not unreasonable for review committee to interview only two people and not issue a report); see also Levine v. Smith, 591 A.2d at 214

---

[6] As noted, "by making a pre-suit demand, a plaintiff concedes the independence and disinterestedness of the board." Levine v. Smith, 591 A.2d at 212; Scattered Corp. v. Chicago Stock Exch., 701 A.2d 70, 74 (Del.1997); see also Levner, 903 F. Supp. 452, 457. A plaintiff can, however, plead facts relating to the Board's failure to act independently, insofar as those facts bear on the "reasonableness" or "bad faith" of the investigation leading to the refusal of demand. Scattered Corp. v. Chicago Stock Exch., 701 A.2d at 74 ("Failure of an otherwise independent-appearing board or committee to act independently is a failure to carry out its fiduciary duties in good faith or to conduct a reasonable investigation. Such failure could constitute wrongful refusal.").

(upholding refusal of demand even though board did not form review committee or retain counsel); <u>Baron v. Siff</u>, 1997 WL 666973, *2-3 (Del. Ch. Oct. 17, 1997) (upholding refusal of demand via letter dated nine days after demand was received that did not state that directors even met to discuss demand).

Plaintiff's additional assertion that the Task Force investigation was too narrow is without merit. <u>See</u> Opp'n at 18. In arguing that the Task Force's focus was too narrow, Plaintiff contends that the report by the U.S. Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations "reviewed the historical development of the CIO's synthetic credit portfolio" in London, whereas the Task Force's report focused "on the events at the end of 2011 and the first several months of 2012." Compl. ¶ 108; <u>see also</u> Opp'n at 20. The Task Force's focus is not evidence that the Review Committee was grossly negligent or that the Board acted in bad faith. Rather, "[w]hile a board of directors has a duty to act on an informed basis in responding to a demand ... there is obviously no prescribed procedure that a board must follow." <u>Levine v. Smith</u>, 591 A.2d at 214; <u>see also</u> <u>Mt. Moriah Cemetery v. Moritz</u>, 1991 WL 50149, *3-4 (De. Ch. Apr. 4, 1991) (rejecting challenge to board's decision not to review documents from before 1985 when alleged wrongdoing began in late 1970s and continued throughout 1980s); <u>Halpert Enters., Inc. v. Harrison</u>, 2008 WL 4585466, at *2 (2d. Cir. Oct. 15, 2008) ("[T]here is no rule of general application that a board must interview every possible witness who may shed some light on the conduct forming the basis of the litigation.").[7] Neither the Review Committee nor the Task Force was obligated to release a report that expressly addresses each and every issue raise by Plaintiff and the other shareholders who made demands on the

---

[7] Plaintiff argues that the Board, in refusing his demand, should not have considered the remedial measures that JPMorgan already had implemented in response to CIO's losses, stating that "[t]hese overdue corporate governance reforms . . . do not absolve the Individual Defendants' personal liability for breaching their fiduciary duties." Compl. ¶ 114. Plaintiff's argument is without merit. Courts in this district have held that remedial measures are an appropriate factor for a board to consider in responding to a shareholder demand. <u>See</u> Halpert, 2007 WL 486561, at *6 ("There appears to be no reason why the Audit Committee or Board should not have considered remedial measures already taken when they decided that suing J.P. Morgan's directors was not in the best interests of the company. Nor does it appear that such consideration would constitute 'gross negligence.'"); <u>see also</u> Stein, 531 F. Supp. at 695 (noting that "the reforms instituted at the recommendation of the Audit Committee had so far been successful and made recurrence unlikely").

10

Board.  See Gatz v. Ponsoldt, 2004 WL 3029868, at *5 & n.28 (Del. Ch. Nov. 5, 2004).  Indeed,

Delaware law is clear that a board of directors need not respond to a shareholder's demand letter

"point-by-point," Baron, 1997 WL 666973, at *3, and the Board's investigation is only reviewed for

gross negligence.  See Halpert, 2008 WL 4585466, at *1.

Under these circumstances, it does not appear that the Board's investigation and analysis were

unreasonable or conducted in bad faith, especially as there is no prescribed procedure or form a Board

must follow when responding to a demand letter.  See, e.g. Baron, 1997 WL 666973, at *3.  Plaintiff

has offered only conclusory allegations that the Review Committee's investigation, and the Board's

subsequent refusal of Plaintiff's demand, rise to the level of "gross negligence."  The allegations in the

Complaint are insufficient to overcome the presumption of the business judgment rule.

### Conclusion

The Defendants' motion to dismiss is GRANTED and Plaintiff's complaint is dismissed in its

entirety.  The Clerk of the Court is directed to close motion #20 on docket 13-cv-02358.


Dated: March 31, 2014
      New York, New York

SO ORDERED:

_George B. Daniel_ (signature)

GEORGE B. DANIELS
United States District Judge

11

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ERNESTO ESPINOZA, Derivatively on behalf
of JPMORGAN CHASE & CO.,

                            Plaintiff,

        -against-

JAMES DIMON, DOUGLAS L. BRAUNSTEIN,
MICHAEL J. CAVANAGH, ELLEN V. FUTTER,
JAMES S. CROWN, DAVID M. COTE, LABAN
P. JACKSON, JR., CRANDALL C. BOWLES,
JAMES A. BELL, LEE R. RAYMOND,
STEPHEN B. BURKE, WILLIAM C. WELDON,
INA R. DREW, WILLIAM H. GRAY, III, and
DAVID C. NOVAK,

              -and-

JPMORGAN CHASE & CO., a Delaware
Corporation,

                      Nominal-Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/2014

13 **CIVIL** 2358 (GBD)

## JUDGMENT
(Derivative Action)

        Defendants having moved to dismiss the Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and the matter having come before the Honorable George B. Daniels, United States District Judge, and the Court, on March 31, 2014, having rendered its Memorandum Decision and Order granting Defendants' motion to dismiss the Complaint and dismissing Plaintiff's complaint in its entirety, it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Memorandum decision and Order dated March 31, 2014, Defendants' motion to dismiss the complaint is granted and Plaintiff's complaint is dismissed in its entirety.

**Dated:** New York, New York
March 31, 2014

RUBY J. KRAJICK
_____
Clerk of Court

BY:
_____
Deputy Clerk

**THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____**